

**NUMBER 13-06-00692-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

WACKENHUT CORRECTIONS CORPORATION
AND WARDEN DAVID FORREST,                                        **Appellants,**

**v.**

GREGORIO DE LA ROSA, SR., ET AL.,                                   **Appellees.**

---

**On appeal from the 404th District Court of Willacy County, Texas.**

---

# O P I N I O N

**Before Chief Justice Valdez and Justices Garza and Benavides
Opinion by Justice Benavides**

This case involves the horrific and gruesome death of Gregorio de la Rosa, Jr. ("Gregorio"). Gregorio, an honorably discharged former National Guardsman, was serving a six-month sentence at a prison operated by Wackenhut Corrections Corporation for possession of less than 1/4 grams of cocaine. A few days before his expected release, Gregorio was beaten to death by two other inmates using a lock tied to a sock, while

Wackenhut's officers stood by and watched and Wackenhut's wardens smirked and laughed.

Gregorio's estate and his family members[1] (collectively "the family") brought survival and wrongful death claims against Wackenhut and its warden, David Forrest, alleging that they negligently caused Gregorio's death and acted with malice and gross negligence. Wackenhut also either lost or destroyed key evidence in this case, prompting the trial court to give a spoliation instruction. The jury found that Wackenhut and Warden Forrest were negligent and acted with gross negligence or malice, and it awarded actual damages to Gregorio's parents and children and punitive damages to Gregorio's estate. The trial court rendered judgment on the verdict, and it also awarded funeral and emergency medical services ("EMS") expenses to Gregorio's estate, though these were not awarded by the jury.

On appeal, Wackenhut and Warden Forrest (collectively "Wackenhut") raise twelve issues attacking nearly every facet of the judgment. We reverse and render judgment dismissing the claims of the estate of Gregorio's father, Gregorio de la Rosa, Sr. ("Gregorio, Sr."), for lack of subject-matter jurisdiction. We also reverse the trial court's award of $7,000 for funeral expenses to Gregorio's estate. However, we affirm the remainder of the judgment.

## I. BACKGROUND

[1] The appellees in this case, who were the plaintiffs below, are: (1) Catalina de la Rosa, Sr., who is Gregorio's mother, individually and on behalf of Gregorio's estate; (2) Gregorio de la Rosa, Sr., who was Gregorio's father and who is now deceased; and (3) Cynthia de la Rosa, who is Gregorio's widow, as guardian and next friend of Gregorio's children—Catalina de la Rosa, Jr., Cynthia Deanna de la Rosa, Jr., and Priscilla de la Rosa. Gregorio's widow also sought recovery below on her own behalf. The jury refused to award her damages. She has not appealed that award. Accordingly, in this proceeding, she only appears in a representative capacity on behalf of her minor children.

2

The family brought suit against Wackenhut after Gregorio was brutally attacked by two other inmates, resulting in his death, at the Wackenhut facility in Willacy County on April 26, 2001.[2]

## A. The Assault

The inmates at Wackenhut live in separate dormitories or "housing" facilities. A "crash gate" guards the walkway leading away from the housing facilities. The crash gate is made out of cyclone fencing material and is closed unless prisoners are passing through the gate. A guard is posted at the crash gate to monitor the prisoners passing through the gate.

On the crash gate's other side, in between the housing unit and the support building, is a 100-yard-long walkway known as the "bowling alley." It is a large sidewalk that is, for the most part, an open area with no buildings immediately adjacent to it. A chain-link fence runs along one side of the sidewalk. There are no guards posted along this walkway.

Wackenhut contracts with the State of Texas to operate the prison, and it is required to follow the State's policies in operating the prison. One such policy is the crash gate "post order," which, according to Warden Forrest, is an order that "gives the officer general guidelines and duties to go by in that particular area." Warden Forrest stated that the guard at the particular post should follow the post order. The crash gate post order stated, "The officer *shall* conduct pat-searches of inmates before permitting entrance or exit to or from any department within the area of responsibility." (Emphasis added). Warden Forrest

---

[2] The family presented several theories of liability, several of which, as is explained by our analysis of the issues in this case, need not be discussed in detail. Because the trial transcript is very long and tedious, and so many theories of liability were presented, we will discuss generally the facts surrounding the incident here and will note the additional theories without including all the details. *See* TEX. R. APP. P. 47.1.

testified that the purpose for searching inmates was to discover contraband, including weapons. The procedures are in place to safeguard the inmates.

Corrections Officer Raul Hernandez[3] was stationed at the crash gate on April 26, 2001. Gregorio and several other inmates, including inmates Pedro Equia and Daniel Sanchez, passed out of their housing facility and through the crash gate on their way to the support building for "pill call."[4] Officer Hernandez testified that he checked the inmates' "passes" to ensure they were allowed to leave the housing unit, but he admitted that he did not pat search Equia or Sanchez.[5] Officer Hernandez stated that if he had searched the inmates, he would have found the lock.

After traveling about half the distance to the support building, Equia and Sanchez attacked Gregorio from behind. At least one of the two inmates possessed a lock tied to a sock and used this as a weapon, striking Gregorio on the head.[6] Officer Hernandez testified that he saw one of the inmates hit Gregorio on the head with the sock, and Gregorio fell to the ground and did not fight back—he "didn't have a chance at all." While Gregorio crouched on the ground, Equia and Sanchez were kicking him, and blood was splattering on the ground.

---

[3] Officer Hernandez testified at trial. In addition, the family played a videotaped interview of Officer Hernandez taken by the Office of Inspector General shortly after the incident. Officer Hernandez's testimony is drawn from that video and his trial testimony.

[4] Apparently, "pill call" is when the inmates are allowed to leave the housing facility and go to the support building to receive medicine.

[5] It was undisputed at trial that neither Equia nor Sanchez were searched.

[6] Only one lock was produced at trial. However, the evidence showed that two lock shanks were discovered at the scene. Officer Juan Cortez testified that after the attack, Wackenhut personnel brought the sock inside and discovered that it contained three locks and two small aluminum cans of food inside. The family theorized that there were two locks, and possibly more, used in the attack, and the other locks were lost or destroyed by Wackenhut.

4

Officer Juan Cortez, another Wackenhut corrections officer, testified that he was standing near the door next to Central Control[7] waiting for inmates to arrive at the education department. He stated that he could see down the "bowling alley" all the way to the housing units through a glass window pane in the door. The officers inside Central Control could also see the "bowling alley" through glass windows. He stated that he saw inmates coming out of the housing unit and that he noticed that the crash gate officer did not pat-search them. He claimed that he knew something was "wrong" when he saw the inmates pass through the crash gate without being pat-searched.

Officer Cortez testified that he saw Gregorio walking down the "bowling alley," and two inmates came up from behind. He saw one inmate take out a sock, swing it, and hit Gregorio on the right side of his head. Gregorio then "bounce[d] down to the floor." The inmate tried to hit Gregorio with the sock again while he was on the ground, and then both inmates began kicking him all over his body. Officer Cortez testified that Gregorio did not respond or fight back because the first hit with the sock knocked him out.[8]

Officer Cortez testified that the beating itself lasted fifteen to twenty minutes before officers arrived and halted the assault and that it took another hour and fifteen minutes for medical personnel to arrive, even though these medical personnel were employed by

_____

[7] "Central Control" is the facility's command center and is located at the end of the "bowling alley" in the support building. It is a secure area that houses the facility's keys, different types of weapons or "use-of-force" equipment, video equipment, and the controls for all of the doors to the facility. Two officers are regularly stationed there, and their duties are to control the facility's doors, issue equipment to the officers, manage the video equipment, and respond to radio and phones.

[8] Major Steve Sangster further testified that Gregorio was basically knocked out when he was hit on the head with the lock, and thereafter, Gregorio could not defend himself. Major Sangster testified that if Equia and Sanchez had not passed through the crash gate with the lock, Gregorio would have had a better chance of defending himself.

5

Wackenhut and were present at the facility at the time.[9] Officer Cortez claimed that Warden Forrest and Assistant Warden Elberto Bravo first arrived approximately forty-five minutes later. He claimed that he saw Warden Forrest standing right inside the door next to Central Control laughing about the incident. Assistant Warden Bravo was also laughing, and another officer, Rodriguez, was smirking. Officer Cortez opined that many of Wackenhut's officers were corrupt. He believed the assault was a "hit" on Gregorio and that Wackenhut's employees knew it was going to happen.

Maria Juanita Marroquin testified she was formerly employed at Wackenhut and was present at the facility on April 26, 2001.[10] Upon hearing the "code black" over the radio about the fight, she went to the door by Central Control. She saw Gregorio on the ground in the "bowling alley," and two inmates were beating him. One was swinging a sock at him.

---

[9] One of the family's main theories at trial was that Wackenhut's officers unreasonably delayed in stopping the fight and in providing medical attention, which was readily available, to Gregorio. Officer Hernandez testified that he immediately called a "code black," which is the code called over the officers' handheld radios notifying them that a fight is in progress. He testified that he attempted to separate the other inmates from the fighting inmates and ordered Equia and Sanchez to stop the attack. At first, they did not stop. Eventually, Equia stopped and laid down on the ground, but Sanchez had to be restrained by another officer. Warden Forrest testified that the fight only lasted approximately thirty seconds, and medical personnel were immediately called to the scene. Warden Forrest testified that Officer Hernandez's actions were appropriate, and an officer should not intervene in an inmate-on-inmate fight until another support officer arrives to assist.

Wackenhut's expert, Gary Johnson, agreed that if officers allowed a fight to last more than five minutes, that would constitute negligence. Officer Cortez testified when the fight started, he saw Officer Hernandez turn his back on the fight. Officer Cortez pushed a button outside the door to the "bowling alley" so that Central Control would allow him outside to stop the fight. The Central Control officer told him "no," and "it's none of your business." He presumed that the Central Control officer did not open the doors to let him out because she was under orders not to let anyone out. Had the officer opened the door, Officer Cortez testified that he would have gone out and stopped the fight himself, and he could have done so in less than a minute. He asserted that when inmates get in a fight, typically all an officer had to do was order them to stop, and they would stop. For this reason, he could have stopped the fight had he been allowed out of the door. If the inmates disobeyed the order, he would have personally intervened and would not have waited for any back up if it appeared that Gregorio was in imminent danger of death.

[10] Wackenhut asserted that Marroquin was not present that day. It introduced employment applications that were dated after April 26, 2001. Marroquin, however, testified that she was allowed to work as a substitute teacher in the education department before she formally applied for a position at Wackenhut because Wackenhut was short-staffed.

She also stated that the beating lasted fifteen to twenty minutes.[11]  She opined that the actions taken would have been different if a guard was being assaulted and that Wackenhut did not value the inmates' lives.  She also stated that she saw Assistant Warden Bravo smirking and laughing after the incident.  She testified that Warden Forrest had a look on his face like "that's one less Mexican he had to worry about."

## B.     Meaning of the Crash Gate Post Order

Warden Forrest testified that the inmates have a right to a safe facility, and the inmates depend on the wardens to ensure that a safe living environment is provided.  He stated that the State promulgates the post order policies and mandates that Wackenhut follow them, and the procedures are imposed to safeguard the inmates.  Warden Forrest acknowledged that he owes a duty and obligation to the inmates to follow all policies and procedures.  He admitted that breach of the policies and procedures will jeopardize the unit's integrity and the inmates' security.  Furthermore, he agreed that if Wackenhut failed to follow the State's procedures, the inmates can suffer serious injuries.  He admitted that the best way to stop a beating is to prevent it from occurring in the first place.

Nevertheless, Wackenhut disputed the meaning of the crash gate post order at trial.  All the witnesses agreed that the post order's plain language was mandatory—stating that the crash gate officer "shall" pat-search the inmates.  However, Wackenhut's witnesses testified that only random searches were required at the crash gate because the order only

---

[11] Marroquin also claimed that she implored the guards to go outside and help, but Officer Cortez told her that Central Control would not let them outside until more guards arrived.  Although this was apparently the explanation given to her and to Officer Cortez, Marroquin stated that there were three guards outside who were standing around watching the fight.  She believed that the number of officers was sufficient for a safe intervention.  She also testified that it took medical personnel an hour to get to the scene after the fight ended.  Finally, Marroquin testified that on occasion the guards would take payment from the inmates to allow a fight to happen.  She believed that the guards stood around and did not intervene because they had been paid off.

7

applied when inmates were entering or exiting from a "department" within the officer's area of responsibility.

Warden Forrest testified that neither the housing unit nor the "bowling alley" were "departments." Thus, because Gregorio, Equia, and Sanchez were not entering or exiting a "department" within the crash gate officer's area of responsibility, the crash gate officer was not required to search every inmate. Major Steve Sangster, the head of security at the Wackenhut facility, testified that the officer working the crash gate was required to follow the crash gate post order. However, he also claimed that neither the housing unit nor the "bowling alley" were "departments," so only random searches were required.

Warden Forrest explained that it was impractical to search all the inmates passing through the crash gate because the officers must keep the inmates moving to avoid congestion at the gate. Warden Forrest was trained to send the inmates through the gate in a group, but he admitted that groups traveling together are dangerous. Nevertheless, he claimed that congestion at the gate could also be dangerous, and it would cause the inmates to be late to their appointments in education and elsewhere. Wackenhut's expert, Gary Johnson, echoed these concerns.

Major Sangster testified that locks are available at the commissary for purchase so that the inmates can lock away their personal items. Major Sangster testified that pat-searches are not 100 percent accurate, and he claimed that even if a pat-search had been conducted, it is not certain that a lock and a sock would have been discovered. However, he agreed that if all the inmates had been searched, the lock probably would have been detected.

Furthermore, he stated that even if the lock had been detected, it may not have been confiscated by the officers if the inmate provided a good explanation for possessing the lock. For example, Warden Forrest testified that if an inmate had purchased a lock and needed to return it to the commissary for some reason, he would be allowed to do so.

On the other hand, Officer Cortez testified that the crash gate post order meant that "you had to search all, each and everybody, coming out of their housing before they got to crash gate . . . ." He testified that every inmate had to be searched because "you don't know within that time frame whether somebody was going to pass contraband or whatever." He claimed that the proper procedure was to search the inmates and let them out of the gate one at a time, with time separating the exit of each inmate:

> Well, I think, start off with, when these people came out of the housing to go to education, okay, first they should have searched the first inmate, give him a little bit, two, three, four minutes, let him walk, then check the other one, give him another two, three minutes like that there's a far walking distance between these people. If something is going to happen that gives time for the officer up front or whoever is in the back to get a glimpse of what's going to happen. You don't send two inmates after one another. You don't do that. It's against policy. I mean, Wackenhut, the employees knew about it. They went against their own rules.

Officer Cortez further testified that if a search had been conducted, the lock would have been discovered, and neither Equia nor Sanchez would have been permitted to pass through the gate at that time:

> Q: (By Mr. Rodriguez) You know how to do pat[-]searches, right?
>
> A: Yes.
>
> Q: You would have found—you would have found that lock if they would have tried—
>
> A: Oh, yes. Oh, yes.

9

. . . .

Q:      And in your opinion, do you think that would have made a difference in the outcome of De La Rosa?

. . . .

A:      Oh, yes.  He'd be alive.

Q:      And why is that?

A:      Because the simple reason that I would have taken out the contraband from the inmate.  I would have dropped him right there. Tell him to drop himself or, you know, we do it.  And I would call, you know, my supervisor, which was Warden Rodriguez at the time, let him know that I have a situation at [the] crash gate.  I have an inmate with contraband, you know, a weapon.  As to what he's going to do with it, I don't know.  See, everything would have ceased right there. There would be nobody coming out, but we would have taken care of the situation right there before it led to where it led.  In this case, that did not happen.

. . . .

Q:      Had that happened, in your opinion, was that De La Rosa would be alive today?

A:      Yes, he would.

Officer Hernandez, who was manning the crash gate on the day of the incident, further agreed that if he had pat-searched Equia and Sanchez, he would have discovered the lock, and Gregorio would likely be alive.

Although Marroquin was working as a substitute teacher in education on the day of the incident, she later was trained and became a corrections officer at Wackenhut. Marroquin testified that the post order required every inmate leaving the housing units to be searched for contraband and weapons.  She testified that had a proper search been conducted, she expected that the searching officer would have discovered the lock.  If she

10

discovered a lock during a pat-search and the lock was not broken, she stated that she would have considered it a weapon.

The family introduced into evidence the State's security audits of the Wackenhut facility. Major Sangster testified that, in 2002 and 2003, Wackenhut was cited for failing to conduct pat-searches as the inmates were leaving the housing facility.

## C.    Previous Assaults at the Wackenhut Facility

Both Warden Forrest and Major Sangster testified that other assaults had occurred in the "bowling alley" area, which was not manned by guards. The trial court admitted four reports offered by the family detailing other incidents at Wackenhut where locks had been used in an assault on an inmate. Major Sangster admitted that he had knowledge of these reports prior to Gregorio's assault.

More importantly, Warden Forrest testified that Equia had assaulted another inmate just a few months before the assault on Gregorio. On January 3, 2001, while at another facility, Equia and another inmate assaulted a fellow inmate by kicking and hitting him. Equia was transferred to the Wackenhut facility at the beginning of February 2001. Apparently, the TDCJ database was updated on February 8, 2001, after Equia was transferred to the Willacy County facility, to note the assault. Warden Forrest stated that he was not aware that the computer system had been updated because the system does not provide notice of updates. He admitted, however, that he had access to this information at any time after February 8, 2001, and before Gregorio was assaulted on April 26, 2001.

**D.     Gregorio's Injuries and Death**

Gregorio suffered severe injuries as a result of the beating.   Officer Valentin Martinez testified that he escorted Gregorio to the medical department.   He testified that Gregorio was "messed up," with blood all over his face and bumps on his head.

The medical department called an EMS team, and Gregorio was taken to the hospital.  Foster Frank Edwards, a Willacy County EMS paramedic, testified that he was dispatched to the jail.  He stated that Gregorio's face was swollen and deformed.  Gregorio was suffering pain in his abdomen, face, back, and neck.  Gregorio refused to lie flat on the stretcher because of the pain he was suffering.   He stated that Gregorio told him that he was about to be released from jail, that things were going to be good for him then, and that he was looking forward to seeing his family.

Robert Sims, M.D., testified that he is an emergency room physician at Valley Baptist Medical Center and that he treated Gregorio.  He is board certified in internal and emergency medicine.  He testified that Gregorio was very seriously injured.  Gregorio was talking, but his clarity was impaired. Gregorio's blood pressure was low and was dropping, and he had facial bruising, black eyes, broken ribs, and a partially collapsed lung.  Sims performed a quick bedside ultrasound and found blood inside Gregorio's abdominal cavity, which indicated that an internal organ was damaged.  By the time he examined Gregorio, between one-fifth and one-fourth of Gregorio's blood had already spilled into his body cavity.

Gregorio died during surgery.  Sims testified that the beating caused Gregorio's death, based on a reasonable degree of medical probability.  He testified that the death resulted from multiple blows to the body and that all the blows were important.

Ruben Lopez, M.D., who performed the surgery on Gregorio, testified he was 100 percent certain that the beating proximately caused Gregorio's death, based on a reasonable degree of medical probability, and he opined that had Gregorio not received the beating, he would be alive. The autopsy report determined that the cause of death was "multiple vascular lacerations, due to: Beating."

## E.      The Spoliated Evidence

Warden Forrest testified that there were video cameras along the facility's perimeter, and the cameras were linked to video recording equipment in Central Control. He testified that the State of Texas required him to ensure that the cameras were in good working condition. These cameras, Warden Forrest explained, could pan and tilt, and they were mounted on perimeter posts to get a "bird's eye view." The cameras were adjustable from Central Control and were always on.

At trial, the family contended that a videotape existed that showed the beating but that this video had been lost or destroyed by Wackenhut. Warden Forrest testified during his deposition that there was a video camera on one of the perimeter posts that was focused down on the beating. In his sworn testimony, he admitted to seeing a tape of the beating and described the video and the beating in detail. His stated that the video showed "that one inmate had beat another inmate with a sock filled with a lock," and it showed an inmate kicking and punching Gregorio.

After reviewing his deposition, however, Warden Forrest changed his testimony, claiming that the video never existed. At trial, he admitted to describing the video in his deposition testimony, but he claimed that his prior testimony describing the video was "based on all the information that I received regarding that incident over and over receiving

13

information." He explained that he had created his "own little movie" in his mind:

> I did that based on all the information that I received regarding that incident over and over receiving information. I put that picture—painted that picture in my head that I believed that's what I saw, and that's what I testified to, and I corrected it that day and at a later date. . . . I described what I thought I saw based on the information of everyone telling me what happened. I painted a picture of that incident in my mind, and I played it over in my mind many, many times since then.

Officer Cortez testified that during his training, he learned that every department had a video camera that was constantly recording in Central Control, and there should have been a camera pointing to the crash gate area. He testified that at the end of the third shift every day, the videotapes were taken to the warden's office, and the warden maintained custody of them. He opined that Wackenhut's wardens destroyed the tapes of Gregorio's beating.

Warden Forrest also admitted that the facility owned and used several handheld cameras to record the use of force by officers when necessary. Officer Cortez testified that after the fight ended, Assistant Warden Bravo recorded Gregorio with a handheld camera and followed Gregorio all the way to the medical department. Officer Cortez testified that the videotape would have shown Gregorio's injuries. Officer Cortez testified that he saw Warden Bravo leave the medical department with the tape in his hand and, later that day, take the video to his vehicle in the parking lot. When asked what he believed Warden Bravo intended to do with the tape, Officer Cortez testified, "I mean, the only thing I can think about what he did with the tape, you know, make sure nobody got a hold of it." This videotape was never produced.

Representatives from the Office of Inspector General of the Texas Department of Criminal Justice arrived at the Wackenhut facility approximately six hours after the beating.

14

Warden Forrest testified that he turned over all the evidence and videotapes to these representatives.[12] Warden Forrest admitted that six hours was plenty of time to destroy, remove, or alter the videotapes, had he so desired.

## F.       Pretrial Rulings on Spoliation

The family filed its original petition on August 29, 2001. On August 16, 2004, the family filed the first of many motions for default judgment and sanctions based on the missing evidence. On September 12, 2005, the parties appeared for a hearing. The court gave Wackenhut thirty days to produce the missing videotapes. No videotapes were produced, so the family moved the court to render a default judgment, which the court granted on October 25, 2005. A hearing was set on damages for November 4, 2005. Before the hearing on damages, Wackenhut produced several videotapes and persuaded the court to reconsider the default judgment and, instead, give a spoliation instruction.[13]

## G.       The Trial Court's Judgment

The case was tried to a jury. The jury found that Wackenhut and Warden Forrest

---

[12] Texas Ranger Rudy Jaramillo assisted with the incident investigation. He stated that the only videotapes turned over to the investigators were the "use of force" videos, which showed the officers restraining Equia and Sanchez after the fight and taking them to the medical department. One videotape showing the use of force by the officers had been partially erased. Ranger Jaramillo admitted that he relied on Warden Forrest to hand over the videotapes and did not conduct an independent investigation into whether any other tapes existed.

[13] Even though the family filed numerous motions for default judgment arguing that Wackenhut was still hiding evidence, the trial court did not grant any of these motions. Instead, the court instructed the jury that Wackenhut spoliated evidence, as follows:

> You, the jury, are instructed that Wackenhut Corrections Corporation and Warden David Forrest destroyed, lost, or failed to produce to this Court material evidence that by law should have been produced as evidence for your deliberations. You are further instructed that you may, but are not required to, presume this material evidence is unfavorable to Wackenhut Corrections Corporation and Warden David Forrest.

Wackenhut has not challenged the trial court's decision to give a spoliation instruction.

were negligent and acted with malice or gross negligence, assigning 75 percent of the responsibility to Wackenhut and 25 percent to Warden Forrest.  The jury awarded $47.5 million in damages as follows:

- Gregorio's estate received zero damages for pain and suffering, disfigurement, and mental anguish; $20 million in punitive damages against Wackenhut; and $500,000 in punitive damages against Warden Forrest.

- Catalina, Sr. (Gregorio's mother) received $2.5 million for past mental anguish, $2.5 million for future mental anguish, $2.5 million for past loss of companionship and society, and $2.5 million for future loss of companionship and society.

- Gregorio, Sr.'s estate (Gregorio's father) received $2.5 million for past mental anguish and $2.5 million for past loss of companionship and society.

- Catalina, Jr. (Gregorio's oldest daughter) received $2 million for future mental anguish and $2 million for future loss of companionship and society.

- Cynthia, Jr. (Gregorio's middle daughter) received $2 million for future mental anguish and $2 million for future loss of companionship and society.

- Priscilla (Gregorio's youngest daughter) received $2 million for future mental anguish and $2 million for future loss of companionship and society.

After trial, the trial court rendered judgment on the verdict and also awarded Gregorio's estate $7,511 for funeral and EMS expenses, finding that these damages were conclusively established by the evidence.  This appeal ensued.

## II. CHARGE ERRORS IN THE LIABILITY QUESTIONS

By its sixth issue,[14] Wackenhut argues that Questions 1, 2, and 3 in the jury charge—the liability questions—failed to submit the correct negligence standard applicable to prisons.  Comparing the family's negligence claim to a premises liability claim, Wackenhut argues that the family waived its negligence claim by failing to secure findings

---

[14] We will address Wackenhut's twelve issues out of order, for convenience.

16

on all the necessary elements. *See, e.g., Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 528-29 (Tex. 1997) (holding plaintiff waived premises defect claim by failing to submit *Corbin* elements). Thus, Wackenhut argues that we must reverse and render judgment that the family takes nothing. *Id.* We hold that Wackenhut waived this argument by failing to sufficiently make the arguments it now makes on appeal known to the trial court.

## A.    The Charge Submitted to the Jury

The charge presented three liability questions based on negligence.[15] Question 1, the "general negligence question," asked, "Did the negligence, if any, of any party named below proximately cause the injuries to and death of Gregorio de la Rosa Jr.?" The jury was presented with three lines to answer the question with respect to Wackenhut, Warden Forrest, and Gregorio. The jury answered "yes" to Wackenhut and Warden Forrest and "no" to Gregorio.

Question 2, the "assumed duty question," asked the same general negligence question as in Question 1 but then provided the following instructions:

> For this question a party named below was negligent if—
>
> a.    A party named below undertook to perform services they knew or should have known were necessary for the protection of Gregorio de

---

[15] The initial instructions to the jury contained definitions pertinent to the entire charge. These included the following:

"Negligence" with respect to Wackenhut Corrections Corporation and Warden David Forrest means failure to use ordinary care, that is, failing to do that which a jailor of ordinary prudence would have done under the same or similar circumstances or doing that which a jailor of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care" with respect to Wackenhut Corrections Corporation and Warden David Forrest means that degree of care that would be used by a jailor of ordinary prudence under the same or similar circumstances.

la Rosa Jr., and

    b.      A party named below failed to exercise reasonable care in performing those services, and

    c.      Performance of these services by a party named below increased the risk of harm to Gregorio de la Rosa Jr.

Again, the jury answered "yes" to both Wackenhut and Warden Forrest and "no" to Gregorio.

Finally, Question 3, the "failure to control question," also asked the same general negligence question as in Questions 1 and 2 but provided the following instructions:

For this question a party named below was negligent if—

    a.      A party named below knew or should have known Equia or Sanchez were likely to cause bodily harm to others if not controlled; and

    b.      A party named below failed to exercise reasonable care to control Equia or Sanchez and such failure proximately caused the injuries to and death of Gregorio de la Rosa Jr.

The jury answered this question the same way it answered the first two questions.

## B.    Wackenhut's Arguments

On appeal, Wackenhut argues that these three liability questions submitted an incorrect duty or standard of care owed by a prison operator. Specifically, it argues that a prison operator's standard of care is as follows:

The general rule gathered from the cases which have considered the question as to liability of an officer in charge of the jail or prison for an injury inflicted by one prisoner upon another prisoner is that, in order to hold the officer liable for such injuries, there must be knowledge on the part of such officer that such injury will be inflicted or good reason to anticipate danger thereof, and negligence in failing to prevent the injury.

*Browning v. Graves*, 152 S.W.2d 515, 519 (Tex. Civ. App.–Fort Worth 1941, writ ref'd).

Wackenhut argues that the liability questions were inadequate or incomplete because they

18

did not instruct the jury that to find the defendants liable, the defendants must know or have reason to believe that an injury will likely be inflicted on another prisoner and thereafter be negligent in failing to take steps to prevent the injury. Wackenhut argues it objected to these errors and requested an instruction containing the appropriate standard. Wackenhut argues that its proposed instruction comported with *Browning*, and the trial court erred when it refused the tendered instruction. *Id.* Likening this case to a premises liability claim, Wackenhut argues that the family waived its negligence claim by failing to submit all the necessary elements of that claim.

With respect to Question 2, Wackenhut argues that the assumed duty theory has never been applied to a prison operator and is wholly inapplicable. It argues that there was no reason to create an assumed duty because the duty that applies is the *Browning* standard. With respect to Question 3, Wackenhut likewise argues that this "failure to control" theory has never been applied in these specific circumstances, and the *Browning* standard should have been applied.

**C.      The Family's Response**

In response, the family argues that Wackenhut waived these arguments by agreeing to the form of the charge. Specifically, the family argues that after a two-day charge conference during which the parties "horse-traded" their jury questions and instructions, Wackenhut agreed to the charge's form and merely reserved its right to make no-evidence objections to the charge. Accordingly, the family contends that Wackenhut is estopped from claiming that the questions were erroneous. *See Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 862 (Tex. 2005) (holding that a party cannot seek a ruling from the trial court

19

and then complain that trial court erred by making the ruling); *Gen. Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 920 (Tex. 1993) (holding that a party cannot request submission of jury issue and then object to its submission); *Am. Nat'l Petroleum Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex. 1990) (holding that a court may hold parties to charge agreements).

The family further argues that Wackenhut's proposed instruction did not preserve error because it also included improper theories of liability, including a standard requiring proof of intentional, willful, or wanton conduct. The family argued that Wackenhut was commingling improper instructions. *See* TEX. R. CIV. P. 278. Furthermore, the trial court did not sign the instruction as refused. *See id.* at R. 276. In any event, the family argues that the applicable law supported each question.

## D.    The Charge Conference

Unfortunately, we cannot explain the basis of our holding without explaining, in detail, the proceedings and arguments made below.[16] On September 14, 2006, the trial court began the arduous process of crafting the jury charge in this case. The parties had been working together to whittle down the remaining charge disagreements. At the

---

[16] Analyzing the charge complaints has been made exceedingly complex due to the record's lack of clarity. On September 14 and 15, 2006, while the trial was ongoing, the trial court held a hearing on the record where the parties discussed their disagreements about the charge. At first, the parties appeared to believe this hearing constituted an informal charge conference during which both parties would attempt to assist the court in crafting the charge. Shortly after beginning the hearing, however, the trial court made it clear that it considered this hearing to be the "formal" charge conference. Due to the numerous disagreements between counsel regarding the charge, this "formal" charge conference was nothing short of chaotic. For example, the trial court interspersed a few of its rulings during the parties' arguments, but it reserved many of its rulings until the end of the hearing, by which time the parties and the court apparently became confused about what rulings had been made or had yet to be made. This resulted in more discussions with the court about issues that one party or the other understood to be previously determined. With that background, and with much chagrin, we proceed to determine whether Wackenhut preserved its complaints about what ultimately became the final charge.

beginning of the hearing, the parties presented the court with three documents, which the court reporter labeled "Court's Charge Exhibits" numbers 1, 2, and 3. Charge Exhibit 1 was an e-mail between the parties discussing their ongoing negotiations, and attached to that e-mail was a document titled, "Defendants' Additions to Proposed Jury Charge." Charge Exhibit 2 was a document titled, "The Parties' Jointly Proposed Court's Charge." It became apparent, early in the hearing, that Charge Exhibit 2 did not contain language that both parties fully agreed to submit. Nevertheless, Charge Exhibit 2 became the basis for the parties' discussion at that hearing.[17]

Initially, Wackenhut argued to the court that Questions 2 and 3, the assumed duty and failure to control questions, should not be submitted because the family should only "go to the jury on one negligence question and that's it." Wackenhut argued that the family would be getting multiple "bites at the apple" by submitting several negligence theories. A short time later, Wackenhut objected "to both the submission of a broad form negligence and the specific granulated form." The trial court stated, "No. Do one or the other." We note that neither of these objections pointed out the specific problem that Wackenhut now argues with respect to these questions, and in fact, created confusion as to what, exactly, Wackenhut believed was the proper form of the negligence submission. Up to this point, it appeared that the parties agreed that a general negligence question should be submitted. Later, Wackenhut reurged these objections with respect to Questions 2 and

---

[17] The questions in Charge Exhibit 2 were labeled alphabetically; however, the final charge was labeled numerically. Question A was the general negligence question without any additional instructions, which ultimately became Question 1 in the jury charge. Question D was the general negligence question with the "assumed duty" instructions, which ultimately became Question 2 in the final charge. Question E was the general negligence question with the "failure to control" instructions, which ultimately became Question 3 in the formal charge. This discrepancy in labeling has made our analysis quite complex. For ease of reference, we will refer to the numbers used in the final charge to identify the questions we are discussing.

21

3, arguing that the theories of liability were subsumed within Question 1's general negligence inquiry.

When further pressed by the court, Wackenhut lodged the following objections to Question 1, the general negligence question:

| [Wackenhut]: | I'm sorry, Your Honor. There is more. It includes within it—Of course, as we mentioned earlier, negligence requires evidence of the standard of care. It's unquestioned in this case that the standard of care took place in a prison environment and it involves balancing the risks of a prison environment in a way that is outside the common experience of the average layperson. As such, as a black letter matter of law, it requires expert testimony as to the standard of care as well as the breach. Absent that testimony, that question simply isn't proper for submission to the jury. I would object on that ground. |
| --- | --- |
| The Court: | Are you finished? |
| [Wackenhut]: | In the alternative, Your Honor, I would argue that the only evidence that there has been or will be, after Mr. Johnson testifies by deposition, is that the standard of care involves adherence to the TDCJ mandated policies that have been already presented as evidence in this case. In that event, I would ask that the jury simply be instructed that that is the standard of care because there isn't any competing evidence in the case. |

At this point, Wackenhut asked the court to apply the State of Texas's policies as the general standard of care.[18] The court did not rule on the objection at that time.

With respect to Questions 2 and 3, Wackenhut again argued that these theories of liability would be subsumed under Question 1 and would be redundant. As against Question 2, Wackenhut argued that the assumed duty question would allow the jury to find

---

[18] We will refer to these arguments as the "TDCJ policy" arguments.

that Wackenhut committed "medical negligence," which would be an impermissible ground of recovery. Furthermore, as against Question 3, Wackenhut argued that there was no evidence that Sanchez had a history of a predisposition to cause bodily harm. Wackenhut did not make any further objections to Questions 2 or 3 at that time.

The parties then moved through the remaining charge issues and discussed various instructions. After addressing all the questions in Charge Exhibit 2, Wackenhut directed the court to Charge Exhibit 1, which contained several instructions that Wackenhut sought to include in the jury charge. First, Wackenhut requested an instruction it called "prison environment":

> It is important that in your deliberations you be aware that this action arises in a penal institution. All inmates assigned to the Willacy County State Jail are convicted felons. In view of the unique nature of the jail environment, jail officials such as the Defendants are given broad discretion in the execution of policies and procedures that, in their judgment, are needed to maintain the internal security, order, and discipline of the jail, and broad deference must be given to their management decisions.

> You are further instructed that, because state jail facilities are occupied by convicted felons, who are either ineligible for or found to be unworthy of release into society, by its very nature, the operation of such a jail is a dangerous task. The reasonableness of Defendants' actions, therefore, must be determined against the backdrop of the jail environment.

> You are further instructed that prison officials are not expected to prevent all inmate-on-inmate violence.[19]

Wackenhut argued that it wanted this instruction at the beginning of the charge to give the jury guidance about what ordinary care means in the circumstances of the case. At the

---

[19] This instruction was crafted by Wackenhut by cherry picking language from federal case law analyzing the Eighth Amendment's prohibition on cruel and unusual punishment. *See Whitley v. Albers,* 475 U.S. 312, 321 (1986) (analyzing cruel and unusual punishment claims)*; Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003) (same); 5th Cir. Pattern Jury Instructions 10.5 (2006) (providing excessive force instructions).

23

time, the court did not rule on whether the "prison environment" instruction would be given or on Wackenhut's TDCJ policy arguments.

Next, Wackenhut requested "an instruction under negligence that comes from Texas Government Code section 497.096."[20]  It argued that the Government Code sets the appropriate burden of proof and the "standard that is required to impose civil liability in this case."  Wackenhut's counsel then read the complete instruction he was requesting:

> You are instructed that an employee of a private prison is not an insurer of the personal safety of the inmates under his supervision and control; the law requires only that the employees in actual charge of the prison exercise ordinary care to prevent prisoners in their custody from harming one another.  In order for David Forrest or the Wackenhut Corrections Corporation to be liable under Texas law, the employees must know or have reason to believe that injury will likely be inflicted or he must have reason to anticipate the danger thereof and therafter be negligent in failing to take steps to prevent the injury.
>
> You are further instructed that a person is not required to anticipate the negligent or unlawful conduct of another.
>
> You are further instructed that Wackenhut Corrections Corporation and David Forrest cannot be held liable if their act or failure to act was not intentional, willfully or wantonly negligent, or performed with conscious indifference or reckless disregard for the safety of others.[21]

---

[20] *See* TEX. GOV'T CODE ANN. § 497.096 (Vernon 2004).  That section provides:

An employee of the Texas Department of Criminal Justice, sheriff, employee of a sheriff's department, county commissioner, county employee, county judge, employee of a community corrections and supervision department, restitution center, or officer or employee of a political subdivision other than a county is not liable for damages arising from an act or failure to act in connection with community service performed by an inmate imprisoned in a facility operated by the department or in connection with an inmate or offender programmatic or nonprogrammatic activity, including work, community service, educational, and treatment activities, if the act or failure to act was not intentional, wilfully or wantonly negligent, or performed with conscious indifference or reckless disregard for the safety of others.

*Id.*

[21] We will refer to this as the "Government Code" instruction.

24

Wackenhut's counsel did not orally state where in the charge the Government Code instruction should be placed. However, in Charge Exhibit 1, this instruction was labeled, "To be included with negligence Question A," which ultimately became Question 1. Wackenhut never argued that this instruction should be included with Questions 2 and 3 or should be placed at the beginning of the charge, to be applicable to all the liability questions.

The family objected that the Government Code instruction was erroneous in whole and in specific parts, particularly the instruction's last two paragraphs, which appeared to require a showing of intentional or grossly negligent conduct. The family argued that the Government Code provision did not apply. In response, Wackenhut argued:

> Brief response, Your Honor. Just that what this does is redefine the standard under these circumstances. Anybody who is taking care of prisoners—This was passed before the legislature gave the executive branch the authority to contract with private enterprises like Wackenhut. We think that what it really does is immunize anybody performing those functions that are listed, in effect, taking care of prisoners. It changes the background law and provides a new standard. *It kind of eliminates the negligence standard and puts this new standard in. . . .*

(Emphasis added). Thereafter, the court stated that it was refusing the additional Government Code instruction but agreed to take the" prison environment" instruction under advisement.

The hearing, however, continued. Later, the court stated that it would refuse the "prison environment" instruction subject to "anything you bring me tomorrow." At the end of the hearing that day, Wackenhut's counsel handed the judge a stack of papers containing all of its requested instructions. However, signed copies of these requests noting the judge's refusal to incorporate the "prison environment" and Government Code

instructions do not appear in the record.

The next day, September 15, 2006, trial continued. After the last witness testified, the parties and the court continued the charge conference. Wackenhut informed the court that the parties had "come to an agreement on a number of issues on the charge," but that there were a few unresolved issues. Wackenhut's counsel informed the court that "we are still asking for the submission of some of the instructions we gave you yesterday. I'm not sure about the list, if we have them there, but we can go through what we have agreed upon."

Wackenhut's counsel informed the court that he was still pursuing the prison environment instruction. In response, the family argued that the appropriate standard of care in a prison case was set out in *Browning,* which applied a "common law negligence standard" and which was submitted "on a negligence question." The family argued that the *Browning* standard was merely an application of the general negligence standard to a prison case and that it was subsumed in ordinary negligence instructions. Wackenhut's counsel then stated that the Government Code "established a different standard of care for the prisons" and that "the standard of care should be what is set out under that provision of the Government Code." He asserted that Wackenhut was entitled to the "higher, willful or wanton standard of care." The court again stated it would not give the requested instructions.

The family then noted that Wackenhut continued to "disagree with the applicability of these three theories. They are still reserving that objection." Wackenhut's counsel explained,

Well, Your Honor, other than the objections we made yesterday to those, the

26

only thing I would add is that in regards to Question No. 2—Question No. 1 is the general negligence question. Other than the argument we had about standard of care, we have no objection to the wording of that . . . straight from the Pattern Jury Charge. . . . No. 2 is a products liability standard. It's from a products liability case. . . . I just don't think we have that, Your Honor. We would disagree that this is even a proper theory to submit to the jury on this issue.

After more arguments about the rest of the charge, the court recessed for lunch.

Upon return, the family's counsel informed the court that the parties had almost completely agreed on the charge's contents:

We've been working on the charge all day. I spent the last two hours with [counsel for Wackenhut] on the charge. And of the seven issues, we are very—I think we've only got maybe one or two issues that we haven't agreed to, that this charge is the correct charge.

The big hangup at this point is the instructions that they have requested the court to submit on prison environment. Okay. What I've done is I've offered to drop the conspiracy claim and to give them the new and independent cause instruction if they would submit to me some reasonable language on what they think the standard of care is, assuming that it's different from a person of ordinary prudence, if they would just tell me in one sentence what they think the standard really ought to be instead of that, because that seems to be what they are saying.

Wackenhut's counsel did not disagree with the family's assertion that the only issue in dispute was the "prison environment" instruction. Rather, he stated that the parties "attempted to see if we could come to a resolution on this," but they "weren't able to." He further stated, "At this point, we are not willing to waive the objections that we've put in the record." After a short break, Wackenhut was allowed to make its no-evidence objections to the charge.

E.     Analysis

As noted above, the family first argues that Wackenhut agreed to the charge's contents and cannot complain now. The record, however, does not show that Wackenhut

27

agreed to the form of the liability questions. A stipulation is "'an agreement, admission, or concession made in a judicial proceeding by the parties or their attorneys, respecting some matter incident thereto.'" *Herschbach v. City of Corpus Christi*, 883 S.W.2d 720, 734 (Tex. App.–Corpus Christi 1994, writ denied) (quoting *Nat'l Union Fire Ins. Co. v. Martinez*, 800 S.W.2d 331, 334 (Tex. App.–El Paso 1990, no writ)). When construing a trial stipulation, we must determine the parties' intent from the language used in the entire agreement "'in the light of the surrounding circumstances, including the state of the pleadings, the allegations therein, and the attitude of the parties in respect of the issues.'" *Id.* (quoting *Discovery Operating, Inc. v. Baskin*, 855 S.W.2d 884, 886-87 (Tex. App.–El Paso 1993, orig. proceeding)). Stipulations that are ambiguous and uncertain in their terms should be disregarded. *Id.* For a stipulation made in open court to be binding, the parties must dictate all material terms into the record and express their assent to those terms. *Id.*

Throughout the hearing, on both days, Wackenhut repeatedly argued against the form of the liability questions. At the end of the two-day hearing, Wackenhut explicitly informed the trial court that it was not willing to waive the objections it had placed into the record. Thus, we hold that the record does not support the family's assertion that the charge's liability questions were submitted by agreement. *See id.* (holding counsel's remarks were insufficient to constitute binding stipulation because they were uncertain and did not recite the terms of any stipulation).[22]

---

[22] The family cites *In re W.J.H.*, 111 S.W.3d 707, 711 (Tex. App.–Fort Worth 2003, pet. denied), arguing that a party who jointly drafts a charge and apparently agrees cannot appeal problems it later asserts with the charge. It is true that the Fort Worth Court of Appeals considered the fact that the appellant assisted in drafting the charge and also apparently agreed to its contents. *Id.* However, the court also held that any error was waived because the appellant did not object or request any different language in the charge. *Id.* Thus, the court's decision that the error was waived was based on the failure to properly raise the issue with the trial court *and* the apparent agreement. *Id.* Here, Wackenhut specifically stated that it was not waiving

28

Nevertheless, Wackenhut's arguments below were not sufficiently clear that we can conclude with confidence that the trial court understood its arguments, and its complaints on appeal do not comport with the arguments that it made in the trial court. To preserve error for appeal, an appellant must have made a

> timely request, objection, or motion that: (A) stated the grounds for the ruling that the complaining party sought from the trial court *with sufficient specificity to make the trial court aware of the complaint*, unless the specific grounds were apparent from the context; and (B) complied with the requirements of the Texas Rules of Civil or Criminal Evidence or the Texas Rules of Civil or Appellate Procedure.

TEX. R. APP. P. 33.1(a)(1)(A)-(B) (emphasis added). Texas Rule of Civil Procedure 274 further explains the requirements for preserving an objection to the jury charge:

> A party objecting to a charge must point out *distinctly* the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless *specifically* included in the objections. When the complaining party's objection, or requested question, definition, or instruction is, in the opinion of the appellate court, *obscured or concealed by voluminous unfounded objections, minute differentiations or numerous unnecessary requests,* such objection or request shall be untenable. No objection to one part of the charge may be adopted and applied to any other part of the charge by reference only.

TEX. R. CIV. P. 274 (emphasis added). With respect to instructions, rule 278 provides that the "[f]ailure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment *unless a substantially correct definition or instruction* has been requested in writing and tendered by the party complaining of the judgment." TEX. R. CIV. P. 278 (emphasis added). Thus, in every manner of pointing out errors in the charge, the appellant is required to make the trial court sufficiently aware of its complaints.

---

its objections to the liability questions in the charge.

Furthermore, objections to the charge and requests for instructions must comport with the arguments made on appeal. *See Isaacs v. Bishop*, 249 S.W.3d 100, 113 n.13 (Tex. App.–Texarkana 2008, pet. denied); *Coke v. Coke*, 802 S.W.2d 270, 275 (Tex. App.–Dallas 1990, writ denied).

In the trial court, Wackenhut argued different standards of care at different times. First, it argued that the TDCJ policies should dictate the standard of care. Second, it proposed the Government Code instruction. The Government Code instruction, however, contained conflicting standards. Initially, the instruction appeared to define ordinary care in a prison environment in accordance with *Browning*. *See* 152 S.W.2d at 519. However, a completely inconsistent standard of care was included at the end of the instruction, which the *Browning* decision does not require. *See id.* The instruction included an admonition to the jury that it could not find the defendants liable unless their acts or failure to act were "intentional, willfully or wantonly negligent, or performed with conscious indifference or reckless disregard for the safety of others." This part of the instruction was drawn from the government code and used language that would have required the jury to find that Wackenhut acted intentionally or was grossly negligent, which would have been improper. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(10) (Vernon 2008) (defining gross negligence as an act or omission "of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others"); *see also Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 916-20 (Tex. 1981) (examining history of gross negligence and the historical use of these terms in gross negligence definitions); *Wheeler v. Yettie Kersting Mem'l Hosp.*, 866 S.W.2d 32,

50 n.25 (Tex. App.–Houston [1st Dist.] 1993, no writ) (stating that the terms "heedless and reckless disregard," "willful act or omission," or "willful and wanton disregard" are synonymous with gross negligence).

Importantly, Wackenhut never argued the instruction's two parts in the alternative. In fact, Wackenhut never emphasized the instruction's *Browning* portion, even though the family's counsel pointed to the *Browning* standard as merely a restatement of general negligence principles. Rather, Wackenhut adamantly emphasized the intent and gross negligence standard on both days of the charge conference. In contrast, on appeal, Wackenhut ignores its gross negligence arguments and now asserts that it only intended to include the *Browning* portion of the instruction.

Wackenhut argues that because its proposed instruction included the *Browning* standard, the trial court should have recognized that all the charge questions were erroneous. Wackenhut argues that a trial court is not entitled to refuse all of an appellant's requested instructions just because they are included in one document with other possibly incorrect instructions. *See Lester v. Logan*, 907 S.W.2d 452, 453 (Tex. 1995). In *Lester*, the supreme court, in denying an application for writ of error, disapproved of the court of appeals' holding that the trial court was not required to sort through a multitude of requests to determine which requests were proper and improper. *Id.* Wackenhut cites several other cases that it claims rejected the argument that a request for an instruction is waived if it is buried in a multitude of requests. *See Alaniz v. Jones & Neuse, Inc.*, 907 S.W.2d 450, 451 (Tex. 1995); *Samedan Oil Corp. v. Intrastate Gas Gathering, Inc.*, 78 S.W.3d 425, 453 (Tex. App.–Tyler 2001, pet. granted, judgm't vacated w.r.m.); *Tex. Natural Res.*

31

*Conservation Comm'n v. McDill*, 914 S.W.2d 718, 724 (Tex. App.–Austin 1996, no writ).

In *Lester*, the supreme court relied on its decision in *State Department of Highways v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992). In *Payne,* the court made it clear that the ultimate test for preservation of charge error is not necessarily whether the appellant strictly complied with the Texas Rules of Civil Procedure's complex procedures for objecting to and requesting items in the charge; rather, the test should be "whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling." *Payne*, 838 S.W.2d at 241.

For example, in *Alaniz*, the supreme court held that the plaintiff preserved his request for a question on future lost profits even though the requested instruction was presented as part of the plaintiff's complete proposed charge, which contained numerous other requests. 907 S.W.2d at 451. The trial court submitted a page from the plaintiff's proposed charge that had included the references to future lost profits, but it had redacted the future lost profits references. *Id.* The plaintiff objected to the omission during the charge conference. *Id.* The court of appeals held that the plaintiff failed to comply with the rules because he (1) included his request as part of a complete charge instead of separately, (2) submitted the request before trial and not after the charge was submitted to the parties, and (3) failed to make his request separate from his objections. *Id.* The court of appeals acknowledged that under *Payne*, the plaintiff's error was likely preserved because the trial court was obviously aware of the complaint. *Id.* Nevertheless, the court of appeals held the objection was waived. *Id.* The supreme court reversed. *Id.* It held that the rules must be applied in a common sense manner and must be interpreted with

32

an eye towards preserving errors in the charge as long as it appears that the appellant made the trial court sufficiently aware of the issue and obtained a ruling. *Id.*

We believe that *Alaniz* and the other cases cited by Wackenhut do not support its arguments. We agree that under *Lester* and *Alaniz*, a submission of instructions en masse or in a complete proposed charge may be sufficient in a given case to alert the trial court to a potential problem in the charge ultimately given.[23] However, in the cases relied on by Wackenhut, there was no indication that the appellant submitted multiple, inconsistent theories to the trial court without arguing them in the alternative or clearly specifying to the trial court which of the theories it believed was correct. *See id.* (holding that the trial court was sufficiently made aware of the complaint); *see also Samedan Oil Corp.*, 78 S.W.3d at 453 (holding that error was preserved on a specific theory of damages without indicating that a contrary or inconsistent theory had been proposed by appellants); *McDill*, 914 S.W.2d at 724 (holding that eleven requests were not too many to conclude that trial court was not alerted to complaint because of en masse submission). Given the apparent initial agreement that a general negligence question was proper, Wackenhut's vacillating and inconsistent definitions of the standards of care, and its repeated emphasis of the incorrect intentional or gross negligence standard, we cannot conclude that Wackenhut sufficiently alerted the trial court to the complaints that it now makes on appeal. *See Payne*, 838

---

[23] *Cf. Hoffman-La Roche, Inc. v. Zeltwanger,* 69 S.W.3d 634, 652-53 (Tex. App.–Corpus Christi 2002) (holding that merely submitting a question to the court as part of an en masse request is not sufficient unless the record also showed that the question was otherwise called to the trial court's attention), *rev'd on other grounds,* 144 S.W.3d 438 (Tex. 2004); *Nat'l Fire Ins. Co. of Pittsburgh, Pa. v. Valero Energy Corp.*, 777 S.W.2d 501, 508 (Tex. App.—Corpus Christi 1989, writ denied) ("The court should not be required to pick through appellant's own tendered issues to construct an instruction to conform to an issue actually submitted; this is the responsibility of the party complaining that a necessary instruction is missing from the court's charge.").

S.W.2d at 241; *see also Castleberry v. Branscum,* 721 S.W.2d 270, 276-77 (Tex. 1986).

With respect to Questions 2 and 3, Wackenhut never objected that these questions did not include the *Browning* standard. Wackenhut's written request indicated that the Government Code instruction was intended to accompany Question 1, and Wackenhut never asked that the instruction be included at the beginning of the charge with the generally applicable instructions. Additionally, Wackenhut never argued that Questions 2 or 3 relied on standards that had never been applied in the circumstances of this case, as it now argues on appeal. Thus, with respect to all the liability questions, Wackenhut's arguments on appeal do not comport with the issue it raised in the trial court. *See Isaacs*, 249 S.W.3d at 113 n. 13; *Coke*, 802 S.W.2d at 275. Accordingly, Wackenhut's arguments with respect to the liability questions are not preserved for our review, and we overrule its sixth issue.[24]

### III. CHARGE ERRORS IN THE APPORTIONMENT QUESTION

In its eighth issue, Wackenhut argues that at least one of the liability questions was improper because the questions submitted incorrect theories of liability or were not supported by the evidence. It argues that even if one of the questions was properly submitted, the judgment cannot be affirmed based on the jury's answer to a proper question because the apportionment of liability question was conditioned on an affirmative finding in any one of the liability questions.[25] Thus, it argues that we must reverse because

---

[24] Because we have held that Wackenhut waived its arguments with respect to the liability questions, we need not address the family's argument that no error is shown because the general negligence instructions correctly set out the applicable law. TEX. R. APP. P. 47.1.

[25] Specifically, for example, Wackenhut argues that assuming that Question 1 was properly submitted but Questions 2 or 3 were not, it was harmed because Question 4 (the apportionment question) was conditioned on an affirmative answer to the liability Questions 1, 2, or 3.

the jury's answers to the apportionment question could have been influenced by an improper theory.[26] *See Romero v. KPH Consol., Inc.*, 166 S.W.3d 212 (Tex. 2005).

We have already determined that Wackenhut waived its challenges to the form of the liability questions. Wackenhut did, however, assert no-evidence objections to all three liability questions.[27] Assuming that at least one liability question was not supported by the evidence, Wackenhut must show that the error in the apportionment question was preserved and that it was harmed by the submission. Texas Rule of Appellate Procedure 44.1(a) provides that a properly preserved error in the trial court merits reversal of the judgment on appeal if it "(1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals." TEX. R. APP. P. 44.1(a). We disagree that Wackenhut's argument has been preserved or that it has shown harm.

On the last day of the charge conference, the following exchange occurred:

[The family]:      Question No. 4 is the comparative question. [Wackenhut's counsel] and I have agreed to move it from Question No. 7 and move it up to Question No. 4.

---

[26] In its seventh issue, Wackenhut argues that the liability questions are not supported by legally or factually sufficient evidence. Ordinarily, we would first assess the legal sufficiency challenge to the liability questions, as this is a rendition issue instead of a remand issue. However, in the interest of brevity, and because we agree with the family that Wackenhut waived its eighth issue, we will address issue eight first. Because issue eight has been waived, if any one of the liability theories is supported by legally and factually sufficient evidence, the judgment may be affirmed on that theory. *See Harris County v. Smith*, 96 S.W.3d 230, 232 (Tex. 2002) (holding that where broad-form objection is not preserved, legal sufficiency challenge is limited to the verdict as a whole) (discussing *Thomas v. Oldham*, 895 S.W.2d 352, 360 (Tex. 1995)).

[27] Wackenhut further argues that the malice and gross negligence question (Question 12) was conditioned on an affirmative finding in Questions 1, 2, or 3, and the exemplary damage questions (Questions 13 and 14) were conditioned on an affirmative answer to the malice and gross negligence question. Wackenhut does not challenge the form of the gross negligence and malice or exemplary damages questions. Although Wackenhut's statement of issues asserts, as its ninth issue, that the malice and gross negligence findings were not supported by legally and factually sufficient evidence, Wackenhut did not brief this issue. *See* TEX. R. APP. P. 38.1(i). Accordingly, we do not address Wackenhut's ninth issue.

35

The Court:          If you have agreed upon it, that's fine.

[Wackenhut]:        Okay.

[The family]:       We've agreed to hook it on question—to an affirmative answer to Question 1, 2, or 3, because those are negligence questions and so we are comparing negligence in this question. This is where the comparative question is going to go.

The Court:          Okay.

[The family]:       We agree to that.

When the court stated it was approving the agreement if Wackenhut agreed, Wackenhut's counsel responded, "Okay." Wackenhut never objected or asked for separate comparative questions at the charge conference, and it never alerted the trial court that the apportionment question commingled valid and invalid theories. *See In re B.L.D.*, 113 S.W.3d 340, 349-50 (Tex. 2003) ("This Court has recently emphasized that complaints of error in broad-form submission must be preserved by objection at trial."); *In re A.V.*, 113 S.W.3d 355, 363 (Tex. 2003) ("Because Puig did not make a specific and timely objection to the broad-form charge, he did not preserve a claim of harmful charge error."); *Gerdes v. Kennamer*, 155 S.W.3d 523, 534 (Tex. App.–Corpus Christi 2004, pet. denied) (holding that appellant waived objection to trial court's failure to include proper conditioning instruction by failing to either object or tender proper conditioning instruction).[28]

Wackenhut does not dispute that it did not raise this specific issue with the trial court. Rather, it argues that in *Romero*, the supreme court held that an objection to the form of an apportionment question is not necessary if the appellant properly objects that

[28] Likewise, Wackenhut never alerted the trial court that the malice, gross negligence, or exemplary damages questions were improperly conditioned on invalid theories.

one of the liability questions is not legally tenable. *See Romero*, 166 S.W.3d at 229. We disagree with Wackenhut's reading of *Romero.*

In *Romero*, the trial court submitted a negligence claim and a malicious credentialing claim. *Id.* at 219. The jury was then instructed that if it found liability under either theory, it should answer a single apportionment of damages question. *Id.* The jury found both negligence and malicious credentialing and then assigned percentages of responsibility. *Id.* On appeal, the defendant argued that there was no evidence to support the malicious credentialing claim, and the supreme court agreed. *Id.* at 224-25. Thus, the court then considered whether the judgment could be sustained on the jury's negligence finding—in other words, whether the defendant was harmed by the submission of the malicious credentialing claim. *Id.* at 225. The court held that it was possible that the jury considered the improper malicious credentialing claim in apportioning responsibility. *Id.* It likened the case to *Crown Life Insurance Co. v. Casteel*[29] and *Harris County v. Smith*,[30] holding that the error prevented the defendant from demonstrating harm. *Id.* at 226.

The plaintiffs in *Romero* argued that, despite the above analysis, the defendant did not preserve its complaint in the trial court. *Id.* at 228. The supreme court reviewed the record to determine whether the trial court was sufficiently aware of the issues being raised on appeal. *Id.* The court noted that during the first day of the charge conference, the trial judge pointed out the problem with submitting a single apportionment question and suggested multiple apportionment questions. *Id.* Then, on the second day of the

---

[29] *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000).

[30] *See Smith*, 96 S.W.3d at 234.

conference, the defendant specifically objected to the submission of a single apportionment question and argued that it would prevent the defendant from showing harm. *Id.* However, the defendant also argued that submitting two apportionment questions would constitute a comment on the weight of the evidence, so it objected to submitting two separate questions. *Id.* Thus, the plaintiff argued that the defendant did not make it clear to the trial court that it wanted two apportionment questions, which would have corrected the problem in the charge. *Id.* at 229.

The supreme court held that the error was preserved. *Id.* The court reasoned:

> [T]he Romeros' argument simply ignores the fact that Columbia's objection to the malicious credentialing question was correct, and had the trial court sustained it, there would have been no problem with the apportionment question. The overruling of that objection created the problem in the single apportionment question that the Romeros requested, *to which Columbia also objected*, also correctly. No more was required of Columbia to preserve its complaints.

*Id.* (emphasis added). Wackenhut points to this language and asserts that an objection that a question is not supported by evidence also preserves an objection to any question that is later conditioned on the question, because "there would be no problem with the apportionment question if the unsupported theory had not been submitted." *See id.*

However, in *Romero*, the court further noted that it did not need to decide whether the defendant "was required to object not only to the lack of evidence for the malicious credentialing claim but also to the form of the apportionment question that included the claim *because it did both*." *Id.* (emphasis added). Thus, the error was preserved. *Id.*

Obviously, that is not what we have in this case. Although Wackenhut did object that all the liability questions were not supported by the evidence, it never pointed out to

the trial court that the conditioning instruction in Question 4 created a problem, and in fact, it *expressly agreed* to the conditioning instruction in Question 4. The ultimate test is whether the trial court was made sufficiently aware of the complaint,[31] and Wackenhut cannot meet that standard because there is nothing in the record that demonstrates the trial court was *ever* made aware of the problem Wackenhut now raises. This is in stark contrast to the facts in *Romero*, *where the trial court itself raised the problem with the apportionment instruction*. *See id.* at 228. Accordingly, Wackenhut failed to preserve its complaint and has failed to show harm. We overrule its eighth issue.

## IV. LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE SUPPORTING NEGLIGENCE AND PROXIMATE CAUSE

By its seventh issue, Wackenhut argues that the evidence was legally and factually insufficient to support the jury's answers to the liability questions; specifically, Wackenhut argues that the family did not meet its burden to prove both negligence and proximate cause under the various theories of negligence presented to the jury. The family submitted

---

[31] As the supreme court explained,

[i]mportant prudential considerations underscore our rules on preservation. Requiring parties to raise complaints at trial conserves judicial resources by giving trial courts an opportunity to correct an error before an appeal proceeds. In addition, our preservation rules promote fairness among litigants. A party "should not be permitted to waive, consent to, or neglect to complain about an error at trial and then surprise his opponent on appeal by stating his complaint for the first time." Moreover, we further the goal of accuracy in judicial decision-making when lower courts have the opportunity to first consider and rule on error. Not only do the parties have the opportunity to develop and refine their arguments, but we have the benefit of other judicial review to focus and further analyze the questions at issue. Accordingly, we follow our procedural rules, which bar review of this complaint, unless a recognized exception exists.

*In re B.L.D.,* 113 S.W.3d 340, 350 (Tex. 2003) (citations omitted). These considerations underscore the court's holding in *Payne*, where the court held that the ultimate test is whether the trial court understood and ruled on the complaints. *State Dep't of Highways v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992). We find these considerations to be particularly relevant to this case.

39

multiple theories of negligence based on Wackenhut's conduct.[32] Because Wackenhut failed to preserve its challenges to the form of the liability and apportionment questions, we may sustain the judgment if any of the theories is supported by legally and factually sufficient evidence. *See Harris County v. Smith*, 96 S.W.3d 230, 232 (Tex. 2002) (holding that where broad-form objection is not preserved, legal sufficiency challenge is limited to the verdict as a whole) (discussing *Thomas v. Oldham*, 895 S.W.2d 352, 360 (Tex. 1995)).

We hold that the evidence was legally and factually sufficient to support the jury's finding of negligence and proximate cause based on Wackenhut's failure to search the inmates at the crash gate, which allowed Equia and Sanchez to pass through the gate with a weapon. This negligent failure proximately caused Gregorio's death. Accordingly, we need not address the other theories of liability. *See* TEX. R. APP. P. 47.1. We will now turn to Wackenhut's specific arguments.

## A.    Standards of Review

When conducting a legal sufficiency review, we view the evidence in the light most favorable to the verdict to determine whether the evidence at trial would allow reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id*. We will

---

[32] First, the family asserted that Wackenhut should have called the ambulance sooner, and if it had, Gregorio would have survived the attack. Second, the family asserted that Wackenhut unreasonably delayed in stopping the assault that caused Gregorio's death. Third, the family claimed that Wackenhut negligently failed to search the attackers at the crash gate, that a search would have uncovered the lock that was used to kill Gregorio, and that a search would have prevented Gregorio's death. Fourth, the family claimed that Wackenhut's sale of locks to inmates was negligent and that had Wackenhut not sold locks to the inmates, Gregorio's death would not have occurred. Finally, the family asserted that Wackenhut was aware that Equia was a dangerous inmate who had previously been involved in a fight and negligently failed to control him.

40

sustain a challenge to the legal sufficiency of evidence only if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Id.* at 810. More than a scintilla of evidence exists, and the evidence is legally sufficient, if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Lee Lewis Constr. Co. v. Harrison*, 70 S.W.3d 778, 782-83 (Tex. 2001). However, "'when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.'" *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

In conducting a factual sufficiency review, we do not substitute our judgment for that of the jury; rather, we view all the evidence in a neutral light to determine whether the evidence is so weak or the finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. *City of Keller*, 168 S.W.3d at 826; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *Villagomez v. Rockwood Specialties, Inc.*, 210 S.W.3d 720, 749 (Tex. App.–Corpus Christi 2006, pet. denied).

## B.    Negligence

Wackenhut raises several arguments against the jury's finding of negligence. First,

Wackenhut argues that the family was required to present expert testimony to establish negligence in a prison environment. Second, Wackenhut makes specific challenges to the evidence presented, including that: (1) there is no evidence that the prison or its officials knew that the attackers planned to assault Gregorio, Jr; (2) the crash gate post order did not require searches of all inmates; and (3) even if the post order required a search of all the inmates at the gate, the breach of that policy does not constitute negligence. We disagree.

### 1. Expert Testimony

Wackenhut first argues that the family was required to present expert testimony to establish negligence. Wackenhut argues that because this case involves a prison environment that is outside the common understanding of lay jurors, expert testimony was required to show that its conduct amounted to negligence in the prison environment. We disagree, and furthermore, we hold that Wackenhut invited the error of which it now complains.

The determination of whether expert testimony is required is a question of law that we review de novo. *FFE Transp. Servs., Inc. v. Fulgham,* 154 S.W.3d 84, 90 (Tex. 2004). Expert testimony is only necessary when the alleged negligence is not within the experience of laymen. *Id.*; *see Melody Home Mfg. Co. v. Barnes*, 741 S.W.3d 349, 355 (Tex. 1987). In other words, expert testimony is required when specialized knowledge is necessary to the determination of the issue. *Fulgham*, 154 S.W.3d at 90. We disagree that specialized knowledge was required to show Wackenhut had a duty to search the inmates passing through the crash gate or that the failure to search the inmates violated

42

this duty.[33]

Wackenhut conceded that it had a duty to ensure the inmates' safety at its facilities. Furthermore, it was undisputed that Wackenhut had a duty to prevent inmates from securing weapons and using them against other inmates. Those issues were never contested at trial.[34] The only issue at trial was how these duties were required to be fulfilled—in other words, how far Wackenhut had to go to detect the possession of weapons by inmates. Specialized knowledge was not required to show that a search should be performed on some or all inmates at a given time. The jury was presented with simple explanations of Wackenhut's reason for not searching every inmate at the crash gate, including preventing inmate congestion that could lead to assaults. The jury was fully able to understand these arguments. We hold that expert testimony was not required to establish a duty or its breach in this case.

Furthermore, Wackenhut successfully excluded the family's expert on negligence by arguing that expert testimony was not required to establish that Wackenhut negligently failed to search the inmates at the crash gate, and we will not allow Wackenhut to switch its position now when it suits it. A party cannot complain on appeal that the trial court took a specific action the complaining party requested. *Tittizer*, 171 S.W.3d at 862. "The invited error doctrine applies to situations where a party requests the court to make a specific ruling, then complains of that ruling on appeal." *In re Dep't of Family & Protective*

---

[33] We note that Wackenhut does not cite a single case to support its argument that expert testimony is required to prove a prison's negligence because the prison environment is outside the common knowledge of a lay person.

[34] *See, e.g., Medina v. Hart*, 240 S.W.3d 16, 24 (Tex. App.–Corpus Christi 2007, pet. denied) (holding that defendant doctor admitted standard of care and only issue of fact for jury was whether, as a factual matter, breach occurred).

*Servs.,* 273 S.W.3d 637, 646 (Tex. 2009). "For a party to be estopped from asserting a position in an appellate court based on actions it took in the trial court, the party must have 'unequivocally taken a position in the trial court that is clearly adverse to its position on appeal.'" *Id.* (quoting *Tittizer*, 171 S.W.3d at 862).

The family offered the expert testimony of Juan Garza, a former sheriff, regarding whether Wackenhut took reasonable steps to search the offenders and whether it negligently failed to implement the crash gate post order. In response, Wackenhut argued that "[t]he jury is perfectly able to interpret what our policy was and how it should have been applied." The trial court agreed, stating:

> To me, your expert needs to give information to the jury that they would not normally have. All of that information has been brought to them. They can make a common sense decision, you know, hey, you know, if they would have patted everybody like they should, like the statute says right there, that they would have caught it. You have argued that point very well, and I think you have already gotten that point across to the jury.

Having successfully convinced the trial court to exclude the family's expert testimony by arguing that expert testimony was not necessary to assist the jury, Wackenhut cannot now complain that such expert testimony was necessary because the issue was beyond the jury's common experience. *Id.* Accordingly, we hold that the family was not required to present expert testimony regarding whether Wackenhut's failure to search the inmates at the crash gate constituted negligence.

### 2. Actual Knowledge of Plan to Assault Gregorio

Wackenhut next argues that the evidence is legally insufficient because, under *Browning*, the family was required to prove that Wackenhut knew that Equia and Sanchez planned to assault Gregorio. That is not what *Browning* says. In fact, *Browning* states that

44

a prison operator can be liable for injuries inflicted on one prisoner by another if the prison knew that such an injury will be inflicted or had "good reason to anticipate danger thereof." *Browning*, 152 S.W.2d at 519; *see also Miller v. Jones*, 534 F.2d 1178 (5th Cir. 1976). Wackenhut is switching positions again—the instruction that Wackenhut submitted, which it argues to this Court was erroneously refused, included language that would have allowed the jury to find Wackenhut negligent not only if it had actual knowledge that Equia and Sanchez planned to assault Gregorio, but also if it found that Wackenhut had "good reason to anticipate" the danger that Equia and Sanchez would assault Gregorio. Accordingly, we reject this argument.

### 3. Evidence Supporting the Verdict

In *Browning*, an inmate named Graves was killed by other inmates in a jail who were in possession of deadly weapons. 152 S.W.2d at 519. The jury found that the sheriff and his deputies negligently caused Graves's death. *Id.* On appeal, the sheriff and the deputies argued that the trial court should have directed a verdict in their favor—a legal sufficiency challenge—because there was no evidence that the sheriff and his deputies knew or should have known that Graves would be injured if he was placed in the cell with the other inmates. *Id.* The court held that the duty required of a jailer in this type of case is to "exercise ordinary care to prevent those confined together from having in their possession weapons with which they might inflict serious injuries upon another prisoner." *Id.* The court held that the evidence was legally sufficient to show a breach of that duty because: (1) the inmates that killed Graves possessed deadly weapons; (2) the officer knew the weapons had been found among those prisoners during prior searches of the

45

compartment; (3) it was not unreasonable to assume that the prisoners would again make and possess the weapons; and (4) the officer had not searched the compartment for a week or ten days prior to Graves's death. *Id.* The court held that "[i]f a jailer whose duty it was to care for and protect his prisoners from harm, would have, in the exercise of ordinary care, discovered the presence of these weapons and removed them, and thus prevent the tragedy that resulted in Graves' death, he, with his principal, the sheriff, would be responsible in damages for having failed." *Id.* We hold that equivalent evidence existed in this case, and that such evidence was legally and factually sufficient to support the judgment.

### a.     Spoliation Instruction

Initially, as proof that Wackenhut was aware or had good reason to anticipate that Equia and Sanchez would assault Gregorio, the family points to the spoliation instruction, which it argues allows an inference that the destroyed videotape would have shown (1) that Equia and Sanchez had bulges in their clothes or had the weapons in plain view, (2) that Equia and Sanchez acted nervously, or (3) other indicia of an imminent assault.  In response, Wackenhut argues that the spoliation instruction did not relieve the family's burden to prove its case.  It further argues that the inferences the family asserts may not be drawn from the missing videotape because there is no evidence or reason to believe that the missing tapes would have shown any of the facts allegedly inferred. *See State ex rel. State Dep't of Highways & Pub. Transp. v. Gonzalez*, 82 S.W.3d 322, 330 (Tex. 2002).

Wackenhut argues that the trial court gave the least severe spoliation instruction available, and it did not "relieve the nonspoliating party of the burden to prove each

46

element of its case." *Trevino v. Ortega,* 969 S.W.2d 950, 960-61 (Tex. 1998) (Baker, J., concurring). Wackenhut argues that the spoliation instruction, by itself, is not sufficient proof of the fact inferred.

Justice Baker, in his concurrence in *Trevino*, explained that there are two types of spoliation instructions typically given by trial courts, each with different effects. *Id.* First, he referred to the most severe type as a "rebuttable presumption":

> The trial court should begin by instructing the jury that the spoliating party has either negligently or intentionally destroyed evidence and, therefore, the jury should presume that the destroyed evidence was unfavorable to the spoliating party on the particular fact or issue the destroyed evidence might have supported. Next, the court should instruct the jury that the spoliating party bears the burden to disprove the presumed fact or issue.

*Id.* at 960. This instruction shifts the burden of proof on the issue to the spoliating party, and it "will enable the nonspoliating party to survive summary judgment, directed verdict, judgment not withstanding the verdict, *and factual and legal sufficiency review on appeal.*" *Id.* (emphasis added). Justice Baker recognized a second, less severe type of spoliation instruction. *Id.* This instruction allows, but does not require, the jury to presume that the evidence would have been unfavorable to the nonspoliating party. *Id.* This is the type of instruction the trial court gave in this case.

We agree that the instruction given in this case does not completely relieve the nonspoliating party of its burden of proof. *Id.* However, Wackenhut essentially invites us to conclude that because the family retained the burden of proof, the spoliation instruction has no effect whatsoever in our review of the record. This is contrary to well-established law that the spoliation instruction at least allows an inference to support the facts that the missing evidence would have established. *See Wal-Mart Stores, Inc. v. Johnson,* 106

47

S.W.3d 718, 724 (Tex. 2003) ("Because the instruction itself is given to compensate for the absence of evidence that a party had a duty to preserve, its very purpose is to 'nudge' or 'tilt' the jury."); *Trevino,* 969 S.W.2d at 952 ("In other words, within the context of the original lawsuit, the factfinder *deduces guilt* from the destruction of presumably incriminating evidence.") (emphasis added); *id.* at 960-61 (Baker, J., concurring) ("The presumption itself has probative value and may be sufficient to support the nonspoliating party's assertions."). We decline Wackenhut's invitation.

Allowing a spoliation instruction to hold probative value and constitute evidence is intended to place the nonspoliating party in the same position as if it had the missing evidence. *Johnson,* 106 S.W.3d at 724. If a spoliation instruction had no evidentiary effect, then its purpose would not be fulfilled by the instruction. *See id.* We hold that the less severe spoliation instruction allows a nonspoliating party to withstand a legal sufficiency challenge to the elements that the spoliated evidence would have proved, because the instruction itself allows an inference of the facts the evidence would have proved. *Id.*

We do not believe that this holding is inconsistent with Justice Baker's statement that the instruction does not relieve the plaintiff of its burden of proof. *Trevino,* 969 S.W.2d at 960-61 (Baker, J., concurring). A plaintiff's burden is to present both legally *and factually* sufficient evidence. As Justice Baker explained, a spoliation instruction of this type "is simply another factor used by the factfinder in weighing the evidence." *Id.* at 961. Thus, while the spoliation instruction given in this case will allow the family to survive a legal sufficiency challenge, it will not, by itself, prevent a successful factual sufficiency challenge,

48

which is intended to prevent a party from recovering when the evidence supporting a finding is so weak or the evidence contrary to the finding is so overwhelming such that the verdict is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *See City of Keller*, 168 S.W.3d at 826; *Jackson*, 116 S.W.3d at 761; *Pool*, 715 S.W.2d at 635. In a factual sufficiency challenge, the spoliation presumption is merely one factor that we must consider in reviewing the evidence for factual sufficiency. *Trevino,* 969 S.W.2d at 61 (Baker, J., concurring).

As stated above, the family argues that the spoliation instruction allowed an inference that the destroyed videotape would have shown that Equia and Sanchez had bulges in their clothes or had the weapons in plain view, that Equia and Sanchez acted nervously, or other indicia of an imminent assault. Wackenhut argues that these inferences may not be drawn from the missing videotape because there is no evidence or reason to believe that the missing tapes would have shown these things. *See Gonzalez*, 82 S.W.3d at 330. Again, we disagree.

At trial, Warden Forrest denied that a videotape ever existed that showed the beating. However, that testimony was impeached by Warden Forrest's deposition testimony, where he unequivocally stated that there were surveillance cameras along the prison's perimeter that were focused down on the beating. In his deposition, he testified to the beating's details based on the video. Although he later claimed that the "video" he was referring to was a picture that he painted in his head based on information relayed to him, the jury was entitled to believe that the earlier deposition testimony was true and that

49

a videotape existing showing the beating.[35]  Warden Forrest testified that the perimeter cameras were mounted on poles to get a "bird's eye view," and these cameras could pan and tilt to different angles.  He admitted that these cameras are always on.

We hold that this evidence was sufficient to support the inferences that the family claims resulted from the missing evidence.  The cameras were always on and could be panned and tilted; thus, it was reasonable to infer that the camera was pointed at the crash gate area where Equia and Sanchez passed through with a lock and then followed them along the "bowling alley" to record the fight.  It is also reasonable to infer that the videotape would have shown conduct by Equia and Sanchez that either alerted or should have alerted Wackenhut to the danger that Equia and Sanchez would assault Gregorio.  We hold that this evidence was legally sufficient to show that Wackenhut was aware that Equia and Sanchez planned to assault Gregorio.

### b.    Testimony at Trial

Nevertheless, even without the spoliation instruction and the resulting inferences, the evidence was legally and factually sufficient to support a finding that Wackenhut had good reason to anticipate the danger that Equia and Sanchez posed to Gregorio, and that Wackenhut was negligent in failing to take steps to prevent the injury.

Warden Forrest admitted that it was Wackenhut's duty to ensure the inmates' safety in the prison.[36]  On the day of the incident, Gregorio, Equia, and Sanchez left their housing

---

[35] Wackenhut does not challenge the trial court's admission of Warden Forrest's testimony for all purposes.

[36] *See Browning v. Graves,* 152 S.W.2d 515, 518 (Tex. Civ. App.–Fort Worth 1941, writ ref'd) ("[I]t is conceded that it is the duty of the officer to use all reasonable efforts to protect his prisoner from harm while in his custody . . . .").

unit and passed through the crash gate into the "bowling alley." The "bowling alley" was a walkway approximately 100 yards long that was not guarded, except at the gates leading to other areas, and there had been other assaults along the "bowling alley" in the past.

It was undisputed that Equia and Sanchez used a deadly weapon—a lock tied to the end of a sock—to kill Gregorio.[37] Warden Forrest and Major Sangster admitted that locks were available at the commissary, and prior to Gregorio's beating, several other fights at the prison had involved the use of locks. Both testified that it was foreseeable that locks could be used as weapons in the future.[38] Nevertheless, it was undisputed at trial that the officer manning the crash gate post, Officer Hernandez, did not search Equia or Sanchez for locks or other contraband.[39]

Warden Forrest and Major Sangster admitted that a "post order" was in place at the crash gate and that the crash gate officer should follow the order. The crash gate post order stated, "The officer shall conduct pat-searches of inmates before permitting entrance or exit to or from any department within the area of responsibility." Warden Forrest testified that the purpose for searching inmates was to discover contraband, including weapons, to safeguard the inmates. Warden Forrest conceded that the post order was mandated by the State of Texas and that Wackenhut was required to follow the policy. He admitted that a breach of State-mandated policies and procedures will jeopardize the unit's and the

---

[37] *Id.* at 519 ("It is undeniably true that the prisoners in cell or tank No. 1 did possess weapons referred to by the witnesses as blackjacks which could be used for the infliction of serious injuries.").

[38] *Id.* ("[I]t is not unreasonable to assume that the prisoners would again make and possess [the weapons] . . . .").

[39] *Id.* ("[The officer] had not searched the compartment for a week or ten days prior to Graves' death.").

51

inmates' security and integrity, leading to inmate injuries.

Officer Cortez testified that the crash gate post order meant that "you had to search all, each and everybody, coming out of their housing before they got to crash gate . . . ." He testified that the reason every inmate had to be searched was because "you don't know within that time frame whether somebody was going to pass contraband or whatever." Both he and Marroquin testified that had the inmates been searched, the lock would have been discovered. Major Sangster admitted that if no search is conducted, the chances of finding contraband and weapons is "zero." He agreed that if the crash gate officer had searched every inmate that passed through the day of the incident, the officer probably would have detected the lock.[40]

Warden Forrest also testified that Equia had been involved in a fight with another inmate on January 3, 2001, before Gregorio's assault. Although Warden Forrest denied specific knowledge of this incident, Warden Forrest admitted that the information was in the TDCJ database as early as February 8, 2001, and was available to him on the computer well before Gregorio's assault. Warden Forrest admitted that he could have accessed Equia's file and determined that Equia had been involved in another attack against an inmate. *See Garrett v. United States*, 501 F. Supp. 337, 338-39 (N.D. Ga. 1980) (noting that an inmate's file, which was transferred with the inmate to a new facility and demonstrated his prior history of violence in prison against other inmates, was sufficient to put the prison on notice of inmate's dangerous propensities).

---

[40] *Id.* ("If a jailer whose duty it was to care for and protect his prisoners from harm, would have, in the exercise of ordinary care, discovered the presence of these weapons and removed them, and thus prevent the tragedy that resulted in Graves' death, he, with his principal, the sheriff, would be responsible in damages for having failed.").

Officer Cortez testified that he believed that the attack was "a hit" on Gregorio and that Wackenhut knew it was going to happen. Moreover, both Marroquin and Officer Cortez testified that they saw Warden Forrest and Assistant Warden Bravo smirking or laughing while Gregorio was being beaten to death. We hold that all this evidence, taken together with the spoliation inferences, constitutes legally and factually sufficient evidence that Wackenhut either had actual knowledge that Equia and Sanchez intended to assault Gregorio or good reason to anticipate the danger thereof and then acted negligently by failing to take steps to prevent the injury.

**4.      Breach of the Post Order**

Wackenhut argues that the post order did not apply, and even if it did require a search of all the inmates at the gate, the breach of that policy does not prove negligence. Warden Forrest insisted that the post order did not require Wackenhut to search every inmate that passed through the crash gate—rather, it only required Wackenhut to *randomly* search inmates. Warden Forrest claimed that the post order only applied to require searches when an inmate is entering or exiting from a "department." He claimed that the housing unit, from which the inmates were exiting, and the "bowling alley," which the inmates were entering, are not "departments." Thus, the policy did not apply. This interpretation was reiterated by Gary Johnson, Wackenhut's expert, who testified that it was not reasonable to expect every offender going through the crash gate to be searched. Moreover, Wackenhut argues that a mere breach of policy is not evidence of negligence, citing *Walden v. State*, 430 So. 2d 1224, 1227 (La. Ct. App. 1983) and *Entex Division of Noram Energy Corp. v. Gonzalez*, 94 S.W.3d 1, 10 & n.19 (Tex. App.–Houston [14th Dist.]

53

2002, pet. denied).[41]

First, by expecting this Court to credit its evidence regarding its interpretation of the post order, Wackenhut inverts the legal sufficiency standard of review. We must "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *City of Keller*, 168 S.W.3d at 827. Wackenhut, however, asks this Court to ignore all the favorable evidence and to credit the evidence it has cherry-picked from the record.

All of Wackenhut's witnesses conceded that the post order states that the officers "shall" search the inmates, and that the policy does not say the officers may "randomly" search the inmates. The jury could read the policy itself and figure out what it meant. Additionally, Officer Cortez, a former corrections officer at Wackenhut, testified that the post order required every inmate to be searched when passing through the crash gate. Wackenhut does not explain or argue why the jury was not entitled to credit this evidence, which supports the verdict. *See id*. At most, Wackenhut merely raises a conflict in the evidence, and it is emphatically within "the province of the jury to resolve conflicts in the evidence." *Id.* at 820.

Next, Wackenhut argues that even if the policy required it to search every inmate, a breach of policy does not prove negligence. As a general proposition, we agree; however, in this case, the crash gate post order embodied the applicable legal standard of care because the order was "designed to prevent injury to the class of persons to which

---

[41] We note that, once again, Wackenhut has switched its tactics. During the charge conference, Wackenhut requested that the court instruct the jury that the TDCJ policies constituted the applicable standard of care. Now, it disputes that a breach of these policies can constitute evidence of negligence.

the injured party belongs." *See Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 549 (Tex. 1985); *Browning,* 152 S.W.2d at 519. The cases cited by Wackenhut do not require a different conclusion. *See Walden*, 430 So.2d at 1227 (holding prison policy of not allowing two inmates out of their cells at the same time, which was violated and which allowed two inmates the opportunity to fight, did not demonstrate that the prison knew or had reason to know that harm would ensue and failed to exercise ordinary care to prevent the harm); *see also Gonzalez*, 94 S.W.3d at 10 & n.19 (holding internal safety procedures did not create a legal duty where none otherwise would exist). When considering both the evidence presented and the spoliation inferences, the evidence supporting Wackenhut's position was not so overwhelming that it requires this Court to hold that the family's evidence was factually insufficient.

## C. Causation

As with negligence, Wackenhut argues that expert testimony was required to prove causation and that the family's evidence was legally and factually insufficient. We disagree.

### 1. Expert Testimony

Wackenhut argues that this case is similar to a medical negligence case, which requires proof that the defendant's negligence caused the plaintiff's death within a reasonable degree of medical probability. *See, e.g.*, *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995). Specifically, Wackenhut argues that the family had the burden to present "probative evidence," not "mere conjecture or guess," that an act or omission was a substantial factor in bringing about Gregorio's death, which would not

55

otherwise have occurred. *Exxon Corp. v. Quinn*, 726 S.W.2d 17, 21 (Tex. 1987). Wackenhut argues that no expert witness testified that Gregorio probably would have survived had all of the inmates passing through the gate been searched.

All of the cases that Wackenhut cites for the proposition that expert testimony is required to prove causation are medical negligence cases. *See, e.g., Milo*, 909 S.W.2d at 511; *Phillips v. Bramlett*, 258 S.W.3d 158, 165 (Tex. App.–Amarillo 2007), *rev'd on other grounds*, No. 07-0522, 2009 WL 567889 (Tex. Mar. 6, 2009); *Arguelles v. UT Family Med. Ctr.*, 941 S.W.2d 255, 258 (Tex. App.–Corpus Christi 1996, no writ); *McDole v. San Jacinto Methodist Hosp.*, 886 S.W.2d 357, 360-61 (Tex. App.–Houston [14th Dist.] 1984, no writ). However, the family's theory that Wackenhut's failure to search the inmates for weapons caused Gregorio's death is not a theory based on medical negligence, which is without a doubt an entirely different sort of claim.

Proximate cause consists of both foreseeability and cause in fact. *Nixon*, 690 S.W.2d at 549. "Cause in fact denotes that the negligent act or omission was a substantial factor in bringing about the injury and without which no harm would have been incurred." *Id.* In contrast, "[f]oreseeability means that a person of ordinary intelligence can reasonably anticipate the dangers that his negligent act or omission created for others." *City of Waco v. Hester,* 805 S.W.2d 807, 814 (Tex. App.–Waco 1990, writ denied).

We agree with the family that common sense and ordinary experience is all that is required to evaluate cause in fact under these circumstances. *See id.* It does not take specialized knowledge to determine whether negligently failing to search inmates for weapons is a substantial factor in bringing about an injury to an inmate when a weapon

goes undetected and then is used to injure another inmate. Nor does it take specialized knowledge to evaluate whether harm would have occurred absent the failure to search the inmates.

With regard to foreseeability, the Waco Court of Appeals has held that "[b]ased on common sense and experience, one can reasonably foresee that a jailer's negligent act may result in an inmate being physically attacked by another prisoner." *Id.* We agree that foreseeability under these circumstances is also within the jury's common knowledge and experience. *Id.* Accordingly, we hold that expert testimony was not required to establish causation.

### 2. Evidence Supporting the Verdict

Next, Wackenhut argues that the evidence is legally and factually insufficient to prove proximate cause because there is no evidence that Gregorio probably would have survived had it searched all of the inmates passing through the crash gate. Wackenhut asserts that no witness testified that searching all the inmates would have prevented the death because the lock could have been missed in a search or it could have been previously hidden in the "bowling alley." Wackenhut presents several theories, arguing that (1) inmates were allowed to have locks; (2) had the lock been discovered, Equia or Sanchez may have claimed that he just purchased it or was returning it to the commissary; (3) the lock did not actually cause much damage; (4) even without the lock, Equia and Sanchez could have attacked and killed Gregorio; and (5) it is more likely that the fatal blow to the spleen area was caused by a kick rather than a blow with the lock.

Again, Wackenhut asks this Court to ignore all the favorable evidence and to credit the evidence it has cherry-picked from the record. At most, Wackenhut merely raises a

57

conflict in the evidence, which the jury was entitled to and did resolve in the family's favor. *City of Keller*, 168 S.W.3d at 820.

In any event, Wackenhut's arguments are not supported by the record. With regard to cause in fact, Robert Sims, M.D., opined within a reasonable degree of medical probability that Gregorio's death was caused by the injuries he received during the assault. He testified that Gregorio died not as a result of any one particular blow, but as a result of numerous blows by the assailants. Furthermore, the spoliated evidence included a missing videotape that could have shown the entire fight. Thus, it permits an inference that the death-causing blow came from the lock instead of a kick by Equia or Sanchez.

Officer Cortez testified that the post order required every inmate leaving the housing units to be searched for contraband and weapons. Both Officer Cortez and Marroquin testified that had a proper search been conducted, the searching officer would have discovered the lock. Officer Hernandez agreed that if he had searched Equia and Sanchez, he would have discovered the lock. Furthermore, Officer Cortez testified that had the lock been discovered, neither Equia nor Sanchez would have been permitted to pass through the gate. Officer Cortez and Officer Hernandez both stated that had the inmates been searched, Gregorio would be alive. We hold that this evidence was legally sufficient to support a finding of cause in fact because it creates a reasonable basis for the jury to conclude that, had Wackenhut searched all the inmates passing through the crash gate, this crime would not have taken place, and Gregorio would be alive. *See Harrison*, 70 S.W.3d at 782-83. Wackenhut has ignored this evidence in the record, and it has not provided this Court with any valid reason requiring the Court to disregard this evidence. The contrary evidence—that a search might not have turned up the lock and that the

58

inmates could have beaten Gregorio anyway even without the lock—is not so overwhelming as to render the evidence supporting the judgment factually insufficient.

We also hold that the evidence was legally and factually sufficient to support a finding of foreseeability. Wackenhut could certainly anticipate that failing to search inmates could result in inmates possessing weapons and using them on other inmates. Warden Forrest and Sangster both testified that they were aware that socks combined with a lock could be used as a weapon and had been used as weapons at Wackenhut in the past. *See Nixon,* 690 S.W.2d at 550 ("The evidence is replete with instances of prior violent crimes occurring at Chalmette Apartments. This record certainly provides evidence that further acts of violence were reasonably foreseeable."). In fact, Warden Forrest and Sangster both agreed that it was foreseeable that locks could be used again in the future. *See id.* Warden Forrest admitted that the purpose of searching inmates was to uncover contraband and weapons. Both testified that fights had occurred in the "bowling alley," where no guard is posted to protect the inmates, and Wackenhut had information that Equia had previously been involved in a fight with another inmate. This evidence was legally and factually sufficient to support the foreseeability element. We overrule Wackenhut's seventh issue.

## V. Recovery of Damages by Wrongful Death Beneficiary's Estate

By its first issue, Wackenhut argues that the trial court erroneously awarded $5 million to Catalina Sr. as the administrator of Gregorio, Sr.'s estate. Gregorio, Sr. brought suit as a wrongful death beneficiary and sought damages for past mental anguish and loss of companionship arising from his son's death. *See* Tex. Civ. Prac. & Rem. Code Ann. §§

59

71.001-.012 (Vernon 2008) (the "Wrongful Death Act"). Before trial, however, Gregorio, Sr. passed away. Wackenhut argues that a wrongful death claim does not survive a beneficiary's death; thus, Gregorio, Sr.'s estate lacked standing to recover damages as a wrongful death beneficiary.

In response, the family argues that Wackenhut waived its right to challenge the estate's ability to recover. First, the family argues that the estate's ability to recover is an issue of capacity, not standing, and Wackenhut waived a capacity challenge by failing to file a verified denial. *See* Tex. R. Civ. P. 93(1); *Pledger v. Schoellkopf*, 762 S.W.2d 145, 146 (Tex. 1988) (holding failure to file verified denial when required by rule waives defense). Second, the family argues that Wackenhut agreed to submit Gregorio, Sr.'s damages to the jury and should not be heard to complain now. Finally, the family argues that Wackenhut's destruction of evidence resulted in lengthy delays in bringing the case to trial, and had Wackenhut complied with its duties to preserve and disclose evidence, Gregorio, Sr. would have likely been alive at the time of trial and able to recover for his injuries. The family reasons that Wackenhut should not be rewarded for the delay by a reduction in the damage award.

We agree with Wackenhut that a wrongful death claim does not survive a beneficiary's death; thus, Gregorio, Sr.'s estate lacked standing. We further hold that because this argument affects the trial court's subject-matter jurisdiction, it is properly before this Court.

A party must have both standing to sue and capacity to sue. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005). The standing inquiry "focuses on whether a party has a sufficient relationship with the lawsuit so as to have a 'justiciable

60

interest' in its outcome, whereas the issue of capacity 'is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate.'" *Id.* (quoting 6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1559, at 441 (2d ed.1990)). "A plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Id.* at 848-49 (citing *Nootsie, Ltd. v. Williamson County Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex.1996)). The distinction is of primary importance in this case because standing affects the trial court's subject-matter jurisdiction and may be raised for the first time on appeal, while capacity must be raised by a verified denial in the trial court. *Id.* at 849.

The Texas Supreme Court has held that an estate's standing to pursue a decedent's claim depends on whether the claim survives the death. *Id.* at 850 ("Because a decedent's survival claim becomes part of her estate at death, it follows that the estate retains a justiciable interest in the survival action."); *see also Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.,* 192 S.W.3d 780, 786 (Tex. 2006) ("Because legal malpractice claims survive in favor of the decedent's estate, the estate has a justiciable interest in the controversy sufficient to confer standing."). Thus, we must determine whether Gregorio, Sr.'s wrongful death claim survived his death in order to determine whether his estate has standing. *See Belt*, 192 S.W.3d at 786.

There is no common-law right to recover for the death of another. *See Coffey v. Johnson,* 142 S.W.3d 414, 417 (Tex. App.–Eastland 2004, no pet.). The Wrongful Death

61

Act provides a statutory cause of action for wrongful death. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 71.004; *Coffey*, 142 S.W.3d at 417; *see also Carter v. Van Meter*, 495 S.W.2d 583, 585 (Tex. Civ. App.–Dallas 1973, writ dism'd). Section 71.004 expressly states that a cause of action for wrongful death is for the "exclusive" benefit of the decedent's surviving spouse, children, and parents. TEX. CIV. PRAC. & REM. CODE ANN. § 71.004. This language indicates that the Texas Legislature intended a cause of action for wrongful death to be personal to the beneficiary. *Carter,* 495 S.W.2d at 586. For this reason, several courts have held that a claim for wrongful death does not survive the beneficiary's death. *See Coffey*, 142 S.W.3d at 417; *Johnson v. City of Houston*, 813 S.W.2d 227, 229-30 (Tex. App.–Houston [14th Dist.] 1991, writ denied); *Carter,* 495 S.W.2d at 586-87; *Huntington v. Walker's Austex Chili Co.*, 285 S.W.2d 255, 258 (Tex. Civ. App.–Waco 1955, writ ref'd). Furthermore, the Wrongful Death Act provides that the damages awarded by the jury must be divided "among the individuals who are entitled to recover and *who are alive at that time.*" TEX. CIV. PRAC. & REM. CODE ANN. § 71.010(b); *see Carter,* 495 S.W.2d at 585. Thus, the legislature expressly contemplated that a beneficiary's right to recover would terminate upon the beneficiary's death. *See Carter,* 495 S.W.2d at 585.

Nevertheless, the family argues that Gregorio, Sr. suffered mental anguish, and this claim was preserved by the Texas Survival Statute. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 71.021 (Vernon 2008). We disagree. In *Huntington v. Walker's Austex Chili Co.*, an infant and his parents were in an automobile accident, and the parents predeceased the infant by ten minutes. *See* 285 S.W.2d at 256. The infant's estate brought a wrongful death action, arguing that the infant's wrongful death claim for his parents' death survived

62

his own death and passed to his estate. *Id.* The estate relied on the survival statute. *Id.* at 258. The court of appeals disagreed. *Id.*

The court interpreted the Texas Revised Civil Statutes article 5525.[42] It looked at the survival statute's language and distinguished between an estate's claim for damages the deceased suffered prior to his death and a wrongful death beneficiary's claim for damages:

> The cause of action that survives is for damages for injuries received by the injured party . . . , which, if he lives, may be recovered by him, but, if he dies from the injuries, then his heirs and legal representatives have the right to recover the same damages that the injured party, had he lived, could have recovered. That is, his right to recover damages because of the injuries which he has suffered up to the time of his death, survives to his heirs and legal representatives.

> The cause of action which Terry Wayne Huntington had by virtue of his parents' death and which is involved herein, was a new cause of action created by the Death Statute, and was for damages suffered by himself—loss of nurture, support and education—by virtue of his parents' death. This new cause of action was for damages not recoverable at common law, but recoverable only by virtue of the Death Statute and for the sole and exclusive benefit of himself.

*Id.* at 258. The court held that the survival statute only provides for survival of the deceased's cause of action for the deceased's personal injuries and death, not for the survival of a wrongful death beneficiary's cause of action. *Id.* The Texas Supreme Court refused the application for writ of error in this case, making the case's authority as binding

---

[42] At the time, the statute provided:

All causes of action upon which suit . . . may hereafter be brought . . . for injuries resulting in death . . . shall not abate by reason of the death of the person against whom such cause of action shall have accrued, nor by reason of the death of such injured person, but, in the case of the death of either or both, all such causes of action shall survive to and in favor of the heirs and legal representatives and estate of such injured party . . . .

*Huntington v. Walker's Austex Chili Co.*, 285 S.W.2d 255, 257 (Tex. Civ. App.–Waco 1955, writ ref'd).

63

as an opinion from the supreme court itself. *See Carter*, 495 S.W.2d 586.

In 1985, the legislature repealed Texas Revised Civil Statutes article 5525 and codified the provision as section 71.021 of the Texas Civil Practice and Remedies Code. *See* Act of May 17, 1985, 69th Leg., R.S., ch. 959, §§ 1, 9, 1985 TEX. GEN. LAWS 3242, 3242, 3297, 3322 (codified at TEX. CIV. PRAC. & REM. CODE ANN. § 71.021). The current statute has not changed in any significant respect.[43] In fact, when article 5525 was repealed and imported into the newly created Texas Civil Practice and Remedies Code, the legislature expressly stated that "no substantive change in the law is intended by this Act." *See id.* § 10, 1985 Tex. Gen. Laws 3242, 3322. Thus, *Huntington* is still binding on this Court, and we hold that a wrongful death beneficiary's claim for the wrongful death of another does not survive the beneficiary's death. *Carter*, 495 S.W.2d 586; *Huntington,* 285 S.W.2d at 258.

Because Gregorio, Sr.'s claim did not survive his death, it follows that his estate lacked standing to pursue the claim. *See Belt*, 192 S.W.3d at 786. Wackenhut's failure to raise this issue in the trial court and its agreement to submit Gregorio, Sr.'s damage claim to the jury did not waive its arguments, which affect the trial court's subject-matter

---

[43] It provides:

(a)      A cause of action for personal injury to the health, reputation, or person of an injured person does not abate because of the death of the injured person or because of the death of a person liable for the injury.

(b)      A personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person. The action survives against the liable person and the person's legal representatives.

(c)      The suit may be instituted and prosecuted as if the liable person were alive.

TEX. CIV. PRAC. & REM. CODE ANN. § 71.021 (Vernon 2009).

jurisdiction. *Lovato*, 171 S.W.3d at 849. We also cannot ignore the defect in the trial court's subject-matter jurisdiction because of Wackenhut's spoliation of evidence below. "While we are sympathetic to the inequity caused by limiting the group of beneficiaries, and are fully aware of the purpose of the statute, we cannot legislate or decline to follow the prior decisions of the Texas Supreme Court." *Johnson*, 813 S.W.2d at 230. Accordingly, we sustain Wackenhut's first issue and reverse the trial court's award of $5 million to Catalina, Sr. as administrator of the estate of Gregorio, Sr., and we render judgment dismissing this claim for lack of subject-matter jurisdiction.

## VI. MENTAL ANGUISH AND LOSS OF COMPANIONSHIP AND SOCIETY DAMAGES

By its tenth, eleventh, and twelfth issues, Wackenhut challenges the damage awards to Gregorio's children and his mother.[44] First, Wackenhut argues that the children's future damages awards cannot be sustained because the jury failed to award them past mental anguish and loss of companionship damages. Second, Wackenhut argues that the evidence was legally and factually insufficient to support the damage awards to the family. We disagree and hold that the evidence is legally and factually sufficient to support the awards to the family.

## A.     Future Damages in the Absence of Past Damages

Wackenhut first argues that the children's awards of future mental anguish and loss of companionship and society damages cannot stand because the jury failed to award past damages. Wackenhut argues that "[g]enerally, when a family member dies the grief or mental anguish that a person experiences diminishes over time. If, as the jury found, the

---

[44] Wackenhut also challenged the award to Gregorio, Sr.'s estate, but we need not address these arguments because we have already held that the estate did not have standing. *See* TEX. R. APP. P. 47.1.

children had no compensable mental anguish or loss of companionship during the five years after their father's death, then there is no reasonable basis for the jury to find that the children would suffer any such damages in the future."

For support, in its brief Wackenhut cited *YMCA of San Antonio v. Adams*, a decision by the San Antonio Court of Appeals, which has since been reversed by the Texas Supreme Court. *See* 220 S.W.3d 1 (Tex. App.–San Antonio 2006), *rev'd,* 265 S.W.3d 915 (Tex. 2008). In that case, the jury awarded future mental anguish damages, but not past mental anguish damages, to a 9-year-old child who was sexually abused by a summer camp counselor. 265 S.W.3d at 916. The court of appeals reversed the award because there was no evidence of future mental anguish and because a presumption of future mental anguish could not be applied given that the jury found no compensable damages in the past. *Id.*

The supreme court reversed, holding that the evidence was legally sufficient to support an award of future damages. *Id.* at 917-18. The court noted that the testimony indicated that children who are sexually abused do not always process the injury immediately, and the issue will have to be dealt with at a time when the child is ready. *Id.* at 917. Occasionally children suppress their distress for many years. *Id.* The court held that the jury's failure to award past mental anguish "does not mean that they found no injury to [the child] in the past . . . ." *Id.* Rather, the "jury's allocation of damages was entirely consistent with the testimony presented that [the child] was coping well by repressing his intense distress, which would inevitably surface in the future." *Id.* at 917-18. The court held that Texas law permits a jury to award future damages to an injured child

66

even if the jury finds that at the time of trial, the child is coping with the injury by suppressing his emotions. *Id.* at 918. Based on this holding, we reject Wackenhut's argument that future mental anguish and loss of companionship damages are prohibited as a matter of law because the jury failed to award past damages, and we will proceed to determine if legally and factually sufficient evidence supports the damage awards.[45] We overrule Wackenhut's tenth issue.

## B. Legal and Factual Sufficiency of the Evidence Supporting the Children's Awards

Wackenhut argues that the awards of future mental anguish and loss of companionship and society to Gregorio's children are not supported by legally and factually sufficient evidence. To recover damages for future mental anguish, a plaintiff must present evidence demonstrating a reasonable probability that the plaintiff will suffer compensable mental anguish in the future. *Id.* at 916. Typically, this requires a showing that in the future, the plaintiff will suffer "'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.'" *Id.* at 916-17 (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995)). In the context of a wrongful death case, mental anguish is concerned "not with the benefits [the beneficiaries] have lost, but with the issue of compensating them for their harrowing experience resulting from the death of a loved one." *Moore v. Lillebo,* 722 S.W.2d 683, 688 (Tex. 1986). A loss of

---

[45] Although Wackenhut argues that generally a person will suffer more intense mental anguish soon after the death of a family member and the pain will ease over time, we disagree that this general principle necessarily applies to all children who have lost a parent. Any parent knows that children process emotional events differently than adults do—often times, in a manner that is illogical and incomprehensible to their adult caretakers. Thus, what may seem like common sense to an adult is not necessarily true when applied to a child. We think it is entirely reasonable that a small child, too young to understand the loss of the parent at the time of death, would suffer more from that loss later in life when they are more able to understand the loss.

consortium claim, on the other hand, compensates for "a loss of positive benefits which flowed to the family from the decedent's having been a part of it." *Id.*

As the supreme court has explained, "wrongful death actions are predicated on the proposition that a wrongful death necessarily destroys any pre-existing family relationship. In most death cases, the emotional impact of the loss of a beloved person 'is the most significant damage suffered by surviving relatives.'" *Id.* at 685. Thus, in wrongful death cases, proof of a familial relationship is some evidence that the surviving family members suffered mental anguish as a result of the death. *Id.* Juries considering mental anguish and loss of companionship and society damages are instructed to consider: "(1) the relationship between husband and wife, or a parent and child; (2) the living arrangements of the parties; (3) any absence of the deceased from the beneficiary for extended periods; (4) the harmony of family relations; and (5) common interests and activities." *Id.* at 688. The jury was so instructed in this case.

Wackenhut argues that there must be direct evidence of the nature, duration, or severity of a plaintiff's anguish, and the plaintiff must establish a substantial disruption in his or her daily routine, or there must be other evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *See Parkway*, 901 S.W.2d at 444. We disagree that to survive a legal sufficiency challenge, a plaintiff must make this strong of a showing in a wrongful death case, in which the familial relationship supports an inference of mental anguish to support an award of these damages. *Id.* at 445 ("As we have noted, historically, some types of disturbing or shocking injuries have been found sufficient to support an inference that the injury was

68

accompanied by mental anguish. As a general matter, though, qualifying events have demonstrated a threat to one's physical safety or reputation *or involved the death of, or serious injury to, a family member*.") (emphasis added); *see Hawkins v. Walker*, 238 S.W.3d 517, 526 (Tex. App.–Beaumont 2007, no pet); *Whipple v. Deltscheff*, 731 S.W.2d 700, 703 (Tex. App.–Houston [14th Dist.] 1987, writ ref'd n.r.e.).

However, the lack of such evidence may require the reviewing court to find that the evidence is factually insufficient to support the award's amount, given that the award must "fairly compensate" the victim for the loss. It appears that many courts have approved large mental anguish awards if there is evidence of severe mental anguish, while smaller awards have been affirmed when the evidence merely showed a close familial relationship. *See Hawkins*, 238 S.W.3d at 526-32 (discussing cases involving large and small mental anguish awards and the quantum of evidence necessary to sustain each). While there is a presumption of some mental anguish from the death of a family member, that presumption does not also require the court to find that the evidence is factually sufficient to support an extremely large award. *Id.* at 531-32.

The evidence in this case not only showed a close familial relationship between Gregorio and his children, but it also showed severe mental anguish that was likely to continue into the future. Catalina, Sr. testified that Gregorio was an honorable man who was responsible for his children. Catalina, Sr. testified that Gregorio's daughters "were his life." He wanted to do the right thing by his children. He tried to be a good provider.

Catalina, Sr. testified that Gregorio knew he had made some mistakes, but he was going to be a good father and was going to correct those mistakes. "He loved his daughters very much[,] and he wanted them to move forward." Catalina testified that

69

Gregorio's daughters will suffer in the future, for example, when they get married. Gregorio will not be there to walk them down the aisle, and that will be painful for them. She testified that Gregorio's children miss him a lot.

Cynthia, Gregorio's widow, admitted that she and Gregorio had some marital problems, but she explained that it never affected the way her children loved their father or how Gregorio loved his daughters. She testified that he was a "stand-up guy," and he was very proud to have served in the National Guard. He never tried to avoid his obligations.

She and Gregorio lived together in Rio Bravo after their marriage. Gregorio was very excited to have children. He told everyone about their first pregnancy. Catalina, Jr., nicknamed "Cat," was born premature. Gregorio would go to work and then go straight to the hospital to visit his tiny daughter. Zulema Salazar, Gregorio's sister, testified that Gregorio stayed by Cat's side the entire time she was in the hospital. Cynthia stated that Gregorio would caress her through the incubator, and he was the first one to hold her. When Cat was a little older, Gregorio would always play with her in the living room and would carry her around. He would take her outside when she was able to walk. He was proud when he took her to her first day of school.

When Gregorio found out Cynthia was pregnant again, he was very happy. They named this child Cynthia, Jr., but nicknamed her "Lulu." Cynthia testified that Lulu was a "daddy's girl." Wherever Gregorio went, Lulu wanted to go. Their youngest daughter, Priscilla, was a surprise. Gregorio was again very happy. Cynthia testified that Gregorio named all three of the children. On the weekends, the family would go out to eat dinner, and Gregorio would take the kids to Wal-Mart to buy new toys. On Sundays, the family

would barbeque and have family gatherings.

Cynthia and Gregorio separated three years after Priscilla was born, which was approximately one year before his death. Nevertheless, there was no doubt in Cynthia's mind that Gregorio loved his children. After the separation, Cynthia moved away, first to Harlingen and then to Corpus Christi. She took the children with her, stating that she "needed a chance to be alone, to evaluate my life, my marriage . . . ." Gregorio then began living with his parents.

The children did not have contact with their father once Cynthia moved to Corpus Christi. However, Cynthia also testified that she never told Gregorio where she had moved. It was her decision not to keep in contact—it was not Gregorio's fault that he could not get in touch with his children.

The children missed Gregorio very much while they were in Corpus Christi, and they wanted to see him. Cynthia testified that for that reason, a few weeks before he passed away, she tried to contact Gregorio so that she could take the children to visit him in prison. Gregorio told her that he did not want the children to see him in jail, so he would visit with them either at his mother's house or he would travel to Corpus Christi to visit after his release. Cynthia testified that she and Gregorio were going to try to reconcile.

When she found out that Gregorio had passed away, she went to Cat's school and removed her from class. Cat was a junior high school student at the time. When Cynthia told Cat what had happened, Cat cried. Cat then helped her mother explain to Lulu and Priscilla what had happened. Cynthia took the children to the home of Gregorio's parents and attended the funeral.

Cynthia testified that the children were very sad and cried a lot. They did not understand why their father was gone, and they wanted their father back. After the funeral, the children struggled with their father's death. Cynthia testified that it was still very hard on them, and the children would cry when they remembered him.

Regarding Cat, Cynthia testified that she was sad when she attended her senior prom because Gregorio was not there. Cynthia testified that regardless of the marital problems she had with Gregorio, she had no doubt that Gregorio would have been there for all the important moments in their children's lives. Cynthia testified that the pain that she and her children will suffer will "last until we die."

Gregorio's sister Zulema also testified that the little girls were traumatized. Cat tattooed the name of her father on herself because "she doesn't want to let go." After Gregorio's death, Lulu did not want to play with her cousins. Zulema testified that Priscilla was very young at the time of Gregorio's death.

Cat testified that she was eighteen years old at the time of trial. She remembered her father and loved him very much. She testified that "[i]t hurts a lot because I just graduated[,] and he wasn't there for me. He was there my first day of school, but when I walked across that stage to receive my diploma, he wasn't there. . . . It made me feel very sad." She testified that she will miss him at important times during her life, such as when she gets married and has a child. She stated that the pain will never go away. She knew there were problems between her parents, but she stated that it never changed her feelings for her father or the way he felt about her.

Lulu testified to several memories she had of her father spending time with her. She loved her father and was very attached to him. She will always miss him, and she does

not think the pain will ever stop. She stated that she cried when she missed him. She stated that she was confused when she went to his funeral. She did not understand why her father had died. Priscilla was nine at the time of trial. She testified that she loved her father, and he loved her. She will miss him and will always remember him.

We hold that all the above evidence demonstrates both a close familial relationship and severe mental anguish that will likely continue into the future. Wackenhut nevertheless makes several arguments against the awards. First, Wackenhut argues that the parties' living arrangements did not support the awards. It argues that because Cynthia separated from Gregorio a year before his death, there is no basis for the jury to believe that Gregorio would ever live with his children again. It also argues that presumably Gregorio would have lived with his parents in Laredo after his release. Thus, Gregorio would have to travel from Laredo to Corpus Christi to visit the children, which is a long distance, and it is not likely he would ever visit them. Second, Wackenhut argues that Gregorio was absent from the children for extended periods during the separation and that there is no evidence that they had regular or frequent visits, and the children never visited Gregorio in prison.

We note, however, that Cynthia testified that she had no doubt that Gregorio would be involved in the children's lives after his release from prison. She also testified that she and Gregorio intended to discuss reconciliation upon his release. Furthermore, even though Cynthia prevented Gregorio from having contact with the children during the year before his death, she also testified that it was her decision to keep their location hidden—it was not because Gregorio did not love his children or want to see them. She stated that because the children missed Gregorio so much, she contacted him a few weeks before his

73

death to schedule a visit. Gregorio asked Cynthia to wait so that his children would not see him incarcerated.[46] Essentially, Wackenhut seeks to visit the mother's sins upon the children, who were minors and were unable to take any action on their own to visit their father. We will not oblige. There is nothing in the record to support Wackenhut's argument, which we find is pure speculation.

Next, Wackenhut argues that there is no evidence that Gregorio had any common interests or activities with his children. We disagree. The testimony was clear that Gregorio was a doting father and that his children enjoyed spending time with him. Again, Wackenhut's arguments are based on pure speculation.

Finally, incredibly, Wackenhut argues that because the children were making good grades in school, strong evidence exists that these children were not suffering severe mental anguish or would not suffer severe mental anguish in the future. We disagree. We commend the children for remaining studious and will not overturn an award of future damages merely because the children remained responsible in their school work. Even those who suffer severe mental anguish can remain responsible for their studies. Wackenhut has not provided any evidence to the contrary. Accordingly, we hold that the evidence is legally and factually sufficient to justify the awards to Gregorio's children. We overrule Wackenhut's eleventh issue.

## C.  Mental Anguish and Loss of Companionship to Gregorio's Mother

As we stated above, proof of a strong familial relationship is legally sufficient

---

[46] Although Wackenhut argues that mental anguish damages should be denied because the children did not visit Gregorio in prison, we decline to so hold. The evidence shows that Gregorio refused the visit, not because he did not want to see his children, but because he did not want his children to see him in the prison environment—a position that we do not regard as avoidance of responsibility.

74

evidence to sustain an award of mental anguish damages in a wrongful death case, and evidence of severe mental anguish will provide factually sufficient evidence to support a large damage award. The evidence showed that Catalina, Sr. enjoyed a close familial relationship with Gregorio and that she suffered severe mental anguish, establishing her right to past and future mental anguish and loss of companionship and society.

Catalina, Sr. testified that Gregorio was her second child and that he was an obedient child and a good son. He always told her that he loved her. She testified that she was very proud of Gregorio for serving in the National Guard. He wrote letters to his parents and sent pictures while he was in the service. She testified that the family was "very united." They would always spend holidays together and were very happy together. Cynthia also testified that the de la Rosa family was very close and that Gregorio loved his mother and father. Whenever his mother wanted help with something, Gregorio was always there for her.

Zulema testified that the family was close-knit. They went to church every Sunday and would barbeque with the family. She stated that Gregorio had "a lot of love and a lot of respect" for their mother. She testified that they shared a loving bond.

Catalina, Sr. testified that Gregorio named his first-born child after her. Cynthia testified that it was Gregorio's idea to name their first daughter after his mother—"He wanted his daughter to carry her name." Cynthia testified that when they were first allowed to bring Cat home from the hospital, they went straight over to Gregorio's parents' house so his parents could meet her.

Catalina, Sr. stated that she was very happy when Gregorio had his first baby. She testified that she and Gregorio's father visited the family after their first daughter was born,

75

and that when she arrived, Gregorio "ran and hugged us, and he told us that we have a daughter." Catalina, Sr. stated that she and her husband would visit Gregorio and his children every opportunity they had.

She testified that when people ask her about her son, she feels very sad. She said that Wackenhut took away her dreams for her life. She feels emptiness from the loss. She testified that she first heard about Gregorio's injury at 4:00 a.m. on April 27, 2001. The prison's chaplain had called them by phone. He informed her that her son was injured and that she needed to come immediately. She testified that they left immediately, and Gregorio's brother and Zulema accompanied them.

Zulema testified that they first went to the prison, and the chaplain came outside and told them to go to the hospital. She said that when they arrived at the hospital, they went to the receptionist and asked to see Gregorio. They were made to wait, and Catalina, Sr. was in a state of panic. The hospital chaplain finally told the family that Gregorio was dead. She testified that all the family members began to cry.

They were not able to see Gregorio in the hospital because his body had already been moved to a funeral home. The first time they were able to see him after the injury was when he was in the funeral home. Zulema said that at first, she was not sure that the body she viewed was Gregorio because he was "beaten up beyond recognition." Zulema stated that Catalina, Sr. did not believe the person she viewed was Gregorio because she could not recognize him. Zulema testified that her mother was incredulous at the funeral home, and her mother cried during the entire funeral. Catalina, Sr. tried to get up to look at the coffin, but her legs were trembling, and she had to sit back down.

Zulema stated that both her parents became very sick over their son's death. They were in a "very depressive state" and constantly crying. They did not want to eat. She stated that Gregorio's death "tore us apart." Zulema opined that her mother is not as strong as she used to be. During the days and weeks that followed Gregorio's death, her mother would hug a picture of Gregorio and cry. Zulema testified that even at the time of trial, her mother would cry at night and say, "Where is my child? Where are you my son?" Zulema testified that since Gregorio, Sr. passed away, her mother cries and says, "Come for me, my son and my husband," and "I feel that death steps are upon me . . . . I really wish I could go with my loved ones"—essentially wishing for her own death.

Catalina, Sr. said it was "terrible, terrible, terrible" to see him at the funeral home. She said the pain will be with her for "the rest of [her] life . . . to see him the way they left him." She said the pain was terrible then, and it is still the same. The pain from losing her son "took her husband," as well. Her husband could not accept the pain, and he "couldn't survive." She said that Gregorio's death "has affected the whole family . . . . And for me, it's going to be a very strong pain, very strong. Nothing will revive it. Nothing will revive it." She said that she "can't stand this pain." She stated that there was "not an instant, not a moment in my life that [Gregorio's] presence is not with us." She missed him very much.

Wackenhut ignores most of this evidence. Rather, it argues first that the parties' living arrangement did not support an award of mental anguish or loss of companionship and society. It argues that at the time of his death, Gregorio was not living with his mother but was in prison. Next, it argues that there is no evidence that Gregorio shared any common interest and activities with his mother. It is true that Gregorio was in prison at the time of his death; however, prior to his incarceration, Gregorio had moved in to his parents'

77

home while he was separated from Cynthia. The testimony also established that the family spent holidays and weekends together. Gregorio named his first daughter after his mother, and the family had a strong bond. Wackenhut's arguments are contrary to the evidence at trial.

Next, Wackenhut argues that in reviewing the award, we should compare the award with those approved by other courts in comparable litigation. It points to awards ranging from $150,000 to $15 million. *See Sanchez ex rel. Estate of Galvan v. Brownsville Sports Ctr., Inc.,* 51 S.W.3d 643 (Tex. App.–Corpus Christi 2001),*vacated w.r.m. sub nom.*, *Honda Motor Co. V. Sanchez*, No. 01-1040, 2003 Tex. LEXIS 8 (Tex. Feb. 6, 2003) ($15 million to each parent for death of child); *Page v. Fulton,* 30 S.W.3d 455 (Tex. App.–Beaumont 2000, pet. denied) ($150,000 to parent). First, we note that Wackenhut points to a jury award that is even larger than the one at issue here. *See Sanchez*, 51 S.W.3d at 653. We find, however, that we are not conclusively bound by a previous jury award because the facts of a given case may justify a higher award. Moreover, the evidence here is certainly strong enough to justify the award of $10 million in this case.

As detailed above, Catalina, Sr. was very close to her son and enjoyed a strong relationship with him—so much so that he named his first-born child after her. The family spent weekends together and family holidays, and Catalina, Sr. was particularly proud of her son, a former National Guardsman. She suffered severe emotional distress due to the brutal murder of her child in the custody of, and at the hands of, those who were charged with his protection. The testimony showed that the wardens smirked and laughed while Gregorio was beaten to death, and Gregorio was beaten so badly that Catalina, Sr. did not recognize him when he was being identified at the funeral home. The testimony showed

78

that Catalina, Sr. clung to Gregorio's picture and cried every night, wishing that her own death would come sooner so that she can join her son. Given the brutal manner in which Gregorio died, the disgusting display of conduct by Wackenhut, the closeness between Gregorio and his mother, and the severe emotional distress she exhibited, we cannot say that the jury award in this case was excessive or that the evidence was legally or factually insufficient. Wackenhut's twelfth issue is overruled.

## VII. ENTITLEMENT TO EXEMPLARY DAMAGES

The jury did not award any actual damages to Gregorio's estate. However, the jury found that Gregorio's injuries and death resulted from the malice or gross negligence of Wackenhut and Warden Forrest, and it awarded Gregorio's estate $20 million in exemplary damages against Wackenhut and $500,000 in exemplary damages against Warden Forrest. The jury did not award any of the other plaintiffs exemplary damages. After the verdict, the trial court awarded Gregorio's estate $7,511 for funeral and EMS expenses, finding that the evidence conclusively established these damage elements. It awarded the punitive damages found by the jury.

In its second and third issues, Wackenhut challenges the trial court's award of funeral and EMS expenses and argues that the exemplary damages awards should be reversed. Wackenhut first argues that the evidence did not conclusively establish the damages for funeral or EMS expenses; therefore, the trial court erroneously awarded these actual damages after the verdict. As a result, according to Wackenhut, there are no actual damages to support an award of exemplary damages, and the damage awards to Gregorio's estate should be reversed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.004(a) (Vernon 2008) ("Except as provided by Subsection (b), exemplary damages may be

79

awarded only if damages other than nominal damages are awarded."); *see also, e.g.,*

*Doubleday & Co. v. Rogers*, 674 S.W.2d 751, 753-54 (Tex. 1984). Additionally,

Wackenhut argues that the family affirmatively waived its right to recover for funeral and

EMS expenses by withdrawing its jury question that would have asked the jury to award

these damages. Furthermore, Wackenhut asserts that the trial court erred in awarding

funeral expenses because there was no pleading to support the award.

In response, the family first argues that Wackenhut should not be heard to complain

about the lack of actual damages because Wackenhut destroyed videotapes of the beating

and of Gregorio's injuries, resulting in the spoliation instruction. The family further argues

that the findings of funeral and EMS expenses should be deemed in support of the

judgment. Second, the family argues that sufficient evidence supports the trial court's

award of funeral and EMS expenses. Third, the family contends that the "zero damage

rule" does not apply when a jury finds the defendants acted with malice. Fourth, the family

argues that the punitive damages should be allowed because all the family members

suffered a legal injury and should be treated as a single unit for purposes of the "zero

damage rule."

## A. Spoliation

First, we must address the family's argument that because Wackenhut destroyed

evidence that would have supported Gregorio's actual damages claim, Wackenhut cannot

be heard to complain about the lack of actual damages. We note that the family has not

cited any authority for this proposition, nor have we located any.

A spoliation instruction, like the one given in this case, creates an inference that can

support the nonspoliating party's claims. *See Trevino*, 969 S.W.2d at 960-61 (Baker, J., concurring). However, when a jury is given the less-severe spoliation instruction and nevertheless finds against the nonspoliating party, it is incumbent upon the nonspoliating party to preserve its right to complain on appeal by raising a cross-point attacking the negative finding or by filing a cross-appeal. *See* TEX. R. APP. P. 38.2(b)(1); TEX. R. APP. P. 25.1(c) ("A party who seeks to alter the trial court's judgment or other appealable order must file a notice of appeal. . . . The appellate court may not grant a party who does not file a notice of appeal more favorable relief than did the trial court except for just cause."); *Trevino,* 969 S.W.2d at 961 (noting that the burden of proof remains on nonspoliating party). The family has not brought a cross-appeal or raised a cross-point challenging the jury's award of zero actual damages to Gregorio. Thus, we are not at liberty to affirm the punitive damage award by merely relying on the spoliation instruction as some evidence of actual damages, specifically because in this case, Wackenhut has challenged the evidence demonstrating that Gregorio's estate incurred funeral and EMS expenses and that the expenses were reasonable. The fact that Gregorio suffered injuries requiring treatment has no bearing on whether the charges were reasonable. *See Dallas Ry. & Terminal Co. v. Gossett,* 294 S.W.2d 377, 382 (Tex. 1956) ("While information regarding the nature of the injuries might be of some assistance to the jury in certain cases in determining the need for treatment, we fail to see its materiality on the question of whether the amounts charged for the treatment are reasonable. And the fact that treatment is necessary is not proof, or a circumstance tending to prove, the reasonableness of the charges made therefor."). With that in mind, we will turn to those awards.

81

**B.      Standard of Review**

After the verdict, although the family did not submit questions on funeral and EMS expenses, the trial court awarded these damages, stating in the judgment that "[t]he uncontroverted evidence showed Gregorio de la Rosa Jr. incurred $7,000 in funeral and burial expenses and $551 in Emergency Medical Service expenses."  Wackenhut argues that the trial court was not entitled to render judgment for these expenses in the absence of evidence conclusively establishing the elements of the expenses.  We agree.  Texas Rule of Civil Procedure 279 governs omissions from the charge.  TEX. R. CIV. P. 279.  It provides:

> Upon appeal all independent grounds of recovery or of defense not *conclusively established* under the evidence and no element of which is submitted or requested are waived.  When a ground of recovery or defense consists of more than one element, if one or more of such elements necessary to sustain such ground of recovery or defense, and necessarily referable thereto, *are submitted to and found by the jury*, and one or more of such elements are omitted from the charge, without request or objection, and there is factually sufficient evidence to support a finding thereon, the trial court, at the request of either party, may after notice and hearing and at any time before the judgment is rendered, make and file written findings on such omitted element or elements in support of the judgment. If no such written findings are made, such omitted element or elements shall be deemed found by the court in such manner as to support the judgment. . . .

*Id.* (emphasis added).  Although the family argues that this rule requires this Court to deem findings on funeral and EMS expenses in support of the judgment, the family does not point us to any element of these damages, "necessarily referable thereto," that was "submitted to and found by the jury . . . without request or objection."  *Id.*

The family cites to *Ramos v. Frito-Lay, Inc.* to support its argument that a deemed finding is required.  784 S.W.2d 667, 668 (Tex. 1990).  In *Ramos*, the trial court submitted,

82

and the jury found, that Frito-Lay's employee committed an intentional tort, and it awarded exemplary damages. *Id.* However, the plaintiff did not submit a question asking whether the employee was acting in a managerial capacity and in the course and scope of his employment. *Id.* The supreme court held that managerial capacity and course and scope constituted elements of the plaintiff's cause of action for exemplary damages and did not constitute an independent ground of recovery. *Id.* Thus, if evidence supported these elements of punitive damages and Frito-Lay failed to object to the omission, these findings could be deemed in support of the judgment. *Id.*

That is not the case here. We hold that funeral expenses and EMS expenses are separate grounds of recovery that are not necessarily referable to a cause of action for punitive damages. *See Lovelace v. Sabine Consol., Inc.*, 733 S.W.2d 648, 655 (Tex. App.–Houston [14th Dist.] 1987, writ denied) (refusing to deem finding of actual damages in tort to support recovery of punitive damages). Moreover, Wackenhut adamantly objected to the inclusion of funeral and EMS expenses in the charge because these claims were not supported by the evidence, and the family withdrew its jury questions on these damages. *See id.* ("Where, however, issues are omitted which constitute only a part of a complete and independent ground and other issues necessarily referable to that ground are submitted and answered, the omitted elements are deemed found in support of the judgment *if no objection is made* and they are supported by some evidence."). Thus, in order to sustain the award of funeral and EMS expenses, we must find that the evidence conclusively established the award. *See id.* ("If an entire theory were omitted from the

charge it would be waived.").[47]

Conclusive evidence can take many forms. *City of Keller*, 168 S.W.3d at 814. Evidence is conclusive of a fact if it is undisputed and permits only one logical inference. *Id.* For example, undisputed physical evidence that cannot be denied is one type of such evidence. *Id.* Additionally, undisputed evidence is conclusive if the opposing party admits it is true. *Id.*

## C. Evidence of Funeral Expenses

The trial court awarded Gregorio's estate $7,000 in funeral expenses. Wackenhut argues that the family did not conclusively establish that Gregorio's estate ever paid or incurred any funeral expenses. Wackenhut argues that the only evidence of funeral expenses came from Gregorio's sister, Zulema Salazar, who testified that she made the funeral arrangements and the cost was $7,000. Finally, Wackenhut argues that there was no evidence offered to show that $7,000 was a reasonable amount for funeral services.

To recover funeral expenses, the plaintiff must prove that the amount charged was reasonable. *See Edwards Transfer Co. v. Brown*, 764 S.W.2d 249, 250 (Tex. App.–Dallas 1987, no writ); *Soliz v. Garcia,* 702 S.W.2d 668, 671 (Tex. App.–Houston [14th Dist.] 1985,

---

[47] Wackenhut cites *Southwestern Bell Telephone Company v. Delanney*, arguing that the failure to secure a jury finding on these damages waived the family's right to recover them. 809 S.W.2d 493, 495 (Tex. 1991). It also cites *Walsh v. Hershey* for the same proposition. 472 S.W.2d 954, 958 (Tex. Civ. App.–Fort Worth 1971, writ ref'd n.r.e.). We disagree that the family waived its right to recover these damages by withdrawing its questions on these damages in response to Wackenhut's objections at the charge conference. If the evidence conclusively established these damages, there was no need for a question asking the jury to resolve a fact issue. *Sullivan v. Barnett*, 471 S.W.2d 39, 44 (Tex. 1970); *GuideOne Lloyds Ins. Co. v. First Baptist Church of Bedford*, 268 S.W.3d 822, 834 (Tex. App.–Fort Worth 2008, no pet.); *Scott v. Sebree,* 986 S.W.2d 364, 370 (Tex. App.–Austin 1999, pet. denied) ("Scott did not request the submission of jury questions on these issues, however, so we are authorized to render judgment that he recover those amounts only if the record contains conclusive proof of their reasonableness and necessity."). Neither *Delanney* nor *Walsh* involved this situation. *See Delaney*, 809 S.W.2d at 495; *Walsh*, 472 S.W.2d at 958 ("The evidence in this case does not establish as a matter of law the reasonable cost of future medical expense Lisa Walsh will in reasonable probability incur after she is twenty-one.").

no writ); *Monsanto Co. v. Johnson,* 675 S.W.2d 305, 312 (Tex. App.–Houston [1st Dist.] 1984, writ ref'd n.r.e.) ("It is generally the plaintiff's burden to offer specific evidence of the reasonableness and necessity of expenses . . . ."); *Folsom Invs., Inc. v. Troutz*, 632 S.W.2d 872, 876 (Tex. App.–Fort Worth 1982, writ ref'd n.r.e.); *see also Landers v. B.F. Goodrich Co.*, 369 S.W.2d 33, 35 (Tex. 1963) (noting that recovery of "reasonable" funeral expenses is allowed in wrongful death actions); *Martinez v. Angerstein*, 517 S.W.2d 811, 816 (Tex. App.–Corpus Christi 1974, writ dism'd w.o.j.) (noting that recovery of "reasonable" funeral expenses is allowed in survival actions).

In *Troutz*, the court of appeals reversed an award of funeral expenses because there was no testimony regarding the reasonableness of the expense. *Troutz*, 632 S.W.2d at 876. The same is true here—there was no testimony regarding whether $7,000 was a reasonable charge for funeral services. Accordingly, the family did not conclusively establish its right to recover these expenses, and the trial court erred by awarding funeral expenses in the judgment. *Id.* We sustain Wackenhut's second issue with respect to the award of funeral expenses.

## D.    EMS expenses

With respect to the EMS expenses, Wackenhut argues that there is no evidence as to the amount of the expenses, that Gregorio's estate ever incurred or paid those expenses, or that the expenses were reasonable. We disagree.

To recover medical expenses, the plaintiff must prove (1) the amount of expense incurred, and (2) that the expense was reasonable and necessary. TEX. CIV. PRAC. & REM. CODE ANN. § 41.0105 (Vernon 2008) ("In addition to any other limitation under law,

85

recovery of medical or health care expenses incurred is limited to the amount actually paid or incurred by or on behalf of the claimant."); *see Monsanto Co.*, 675 S.W.2d at 312; *see also Reliance Steel & Aluminum Co. v. Sevcik*, 268 S.W.3d 65, 69 (Tex. App.–Corpus Christi 2006), *rev'd on other grounds*, 267 S.W.2d 867 (Tex. 2008). Medical expense statements can be used to prove the amount of the expense actually incurred, but there must be further testimony establishing that the expense was reasonable. *Monsanto Co.*, 675 S.W.2d at 312.

First, Wackenhut argues that there is no evidence of the amount incurred by Gregorio's estate or that Gregorio's estate ever paid the expenses. We disagree. Samuel Garza testified by deposition that he was the ambulance driver for Willacy County EMS on the day that Gregorio was injured. During Garza's testimony, the family's counsel referred to deposition exhibit 5, and he asked if "[t]his is the billing for Willacy County?" Garza replied that it was the bill. Garza then testified that the services provided were necessary to treat Gregorio. Referring back to that bill, the family's counsel then asked if "these" charges were "reasonable charges based on your current knowledge." Garza replied that they were. Continuing with the questioning, the family's counsel asked if $551.50 is a "reasonable charge for the services . . . provided?" Garza again replied that it was. After the deposition was played to the jury, the family's counsel offered all the deposition exhibits into evidence as plaintiff's exhibit 43; however, deposition exhibit 5 was not included with the documents that ultimately were admitted.

A reasonable reading of this testimony established that the bill was for $551.50. During Wackenhut's cross-examination of Garza, Garza was never questioned whether $551.50 was the amount charged by Willacy EMS or whether the bill was paid. Thus, this

evidence was uncontradicted, and it conclusively established that Gregorio incurred these charges. *City of Keller*, 168 S.W.3d at 814.

Next, Wackenhut argues that the evidence did not conclusively establish that the charges were reasonable and necessary. Wackenhut argues that the family relied on Garza's testimony, and Garza was unqualified to render such an opinion because he was merely the ambulance driver. Wackenhut argues that the trial court erred in finding Garza qualified. Wackenhut, however, ignores Garza's testimony that he was currently employed at Pro-Medic EMS in San Antonio, that his current job was in billing, and that he was familiar with the standard charges, more or less, of a particular call. Wackenhut does not explain why this testimony does not qualify Garza to testify about the reasonableness of the billing. *See Medina v. Hart*, 240 S.W.3d 16, 22 (Tex. App.–Corpus Christi 2007, pet. denied) (noting that the court could overrule issue by appellant who did not distinguish or explain other evidence in record supporting judgment).

Moreover, Foster Frank Edwards, a paramedic with the Willacy County EMS, also testified by deposition that he administered emergency care to Gregorio. During the deposition, the family's counsel referred to a bill for EMS services. The following exchange occurred:

> Q: And basically, it goes through there, the lactated ringers, the oxygen, supplies, and everything else you gave. It says that the total charges here are $551.50. Is this a fair and reasonable amount for the charges that are—
>
> A: Sir, I have nothing to do with the billing or the office. I didn't even know how much they did charge, sir.
>
> Q: That's all right. But certainly, the—the services that were provided were necessary in order to treat him?

87

A: Yes, sir.

Q: In your opinion?

A: Yes, sir.

Q: All right. And you don't—you've never known the Willacy County EMS to be unreasonable in their charges, have you?

A: No, sir.

Q: All right. So the best you know, that these are reasonable charges for the—

A: Yes.

Q: —services provided, right?

A: Yes, sir.

Q: And they were necessary for the medical services that you provided—

A: Yes, sir.

Wackenhut again ignores this testimony in the record, which constitutes evidence that $551.50 was a reasonable charge for necessary services that were provided to Gregorio. Because Wackenhut has not argued that Edwards' testimony was improperly admitted, it cannot show harm from the admission of Garza's testimony. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex. 1989) (holding error in admission or exclusion of evidence is not reversible if the evidence is cumulative of other evidence in the record). Accordingly, we overrule Wackenhut's second issue as it applies to the award of EMS expenses. Furthermore, having found that the award of EMS expenses was proper, we overrule Wackenhut's third issue challenging the award of exemplary damages as not being supported by an award of actual damages.

88

**E.    Application of the "Zero Damages Rule" when Jury Finds Malice**

Nevertheless, even if the trial court erred in awarding damages for funeral and EMS expenses, we hold that the malice finding precludes the application of the "zero damages rule" in this case. Wackenhut argues that because the jury failed to award actual damages and the trial court's award of funeral expenses and EMS expenses was erroneous, there is no award of actual damages to support the award of punitive damages. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.004(a) (Vernon 2008). In response, the family asserts that the "zero damages" rule does not apply to its claim for wrongful death because the jury found that Wackenhut acted with "malice," which supplanted the requirement for actual damages under the applicable, 1995 version of the statute.

At common law, punitive damages were not permitted unless the plaintiff recovered actual damages. *See Doubleday & Co.*, 674 S.W.2d at 753-54. An award of merely nominal damages was insufficient to sustain a recovery of punitive damages. *Id.* at 754. In 1987, this rule was codified as Texas Civil Practice and Remedies Code section 41.004, and that section was amended in 1995.[48] *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 TEX. GEN. LAWS 37, 44 (adding Chapter 41 of the civil practice and remedies code); Act of Apr. 6, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 TEX. SESS. LAW SERV. 108, 110 (Vernon). In 1995, it provided:

> (a)    *Except as provided by Subsection (b)*, exemplary damages may be awarded only if damages other than nominal damages are awarded.

---

[48] Wackenhut relies on the current version of the Texas Civil Practice and Remedies Code. The family, however, correctly points out that the 1995 version of section 41.004 applies to this case, which was filed on August 29, 2001. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 13.05, 23.02(d), 2003 TEX. SESS. LAW SERV. 847, 888, 898 (stating that the prior version applied to cases on file prior to the effective date). Accordingly, all further references herein are to the 1995 version of the civil practice and remedies code.

(b)     *A claimant may recover exemplary damages, even if only nominal damages are awarded, if the claimant establishes by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from malice as defined in Section 41.001(7)(A).* Exemplary damages may not be awarded to a claimant who elects to have his recovery multiplied under another statute.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.004.  Subsection (b) modified the general rule that nominal damages are insufficient to sustain an award of punitive damages, if certain conditions are met.  *Id.*

The 1995 version of Chapter 41 defined "malice" as:

(A)    a specific intent by the defendant to cause substantial injury to the claimant; or

(B)    an act or omission:

    (i)    which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

    (ii)    of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7).  Question 12 of the jury charge asked whether the jury found by clear and convincing evidence that Gregorio's injuries and death resulted from Wackenhut or Warden Forrest's malice or gross negligence.  The charge's definition of "malice" or "gross neglect" tracked the 1995 version's definition of malice exactly.   The jury found that both Wackenhut and Warden Forrest acted with malice or gross negligence, and neither Wackenhut nor Warden Forrest has challenged this finding on appeal.

The problem with the family's argument, however, is that the 1995 version of the statute allowed a plaintiff to recover exemplary damages based on a finding of malice "even if only nominal damages are awarded." TEX. CIV. PRAC. & REM. CODE ANN. § 41.004; *see Bic Pen Corp. v. Carter*, 251 S.W.3d 500, 510 (Tex. 2008) ("At the time, this statute also provided that the claimant could recover exemplary damages, even if only nominal damages were awarded, but only if it established by clear and convincing evidence that the harm resulted from malice . . . ."); *Waste Disposal Ctr., Inc. v. Larson,* 74 S.W.3d 578, 589 (Tex. App.–Corpus Christi 2002, pet. denied) ("Except where there are nominal damages which result from malice and in wrongful death claims involving workers' compensation, exemplary damages may be awarded only if damages other than nominal damages are awarded."); *Perez v. Perez*, No. 09-05-024-CV, 2005 WL 2092807, at *2 (Tex. App.–Beaumont Aug. 31, 2005, no pet.) (mem. op.). In other words, a malice finding would allow a plaintiff to recover exemplary damages in the absence of actual damages, but only if the jury at least awarded nominal damages. Had we found the award of EMS expenses was erroneous, that would not be the case here. The jury did not award nominal damages to Gregorio.

To remedy this situation, the family argues that if Gregorio's estate is not entitled to recover actual damages, we may consider the jury's award of damages to the wrongful death beneficiaries. The 1995 version of Section 41.001(1) defined "claimant" as

> a party, including a plaintiff, counterclaimant, cross-claimant, or third-party plaintiff, seeking recovery of exemplary damages. *In a cause of action in which a party seeks recovery of exemplary damages related to injury to another person, damage to the property of another person, death of another person, or other harm to another person, "claimant" includes both that other person and the party seeking recovery of exemplary damages.*

91

TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(1) (emphasis added).  The family argues that all wrongful death beneficiaries must be treated together as one "claimant" for purposes of section 41.004's prohibition on exemplary damages.  Thus, because the wrongful death beneficiaries recovered at least nominal damages, those damages must be considered when applying section 41.004 to the award to Gregorio's estate.

We agree that the damages awarded to Gregorio's children must be taken into account.[49]  "Under section 41.001(1), when a party is seeking exemplary damages for the death of an individual, both the deceased and the persons seeking recovery are defined as a claimant." *Gen. Chem. Corp. v. De la Lastra,* 852 S.W.2d 916, 923 (Tex. 1993); *see Tex. Health Enters., Inc. v. Geisler*, 9 S.W.3d 163, 169 (Tex. App.–Fort Worth 1999, pet. dism'd) ("Further, chapter 41 expressly indicates that the actual damages to be quadrupled encompass the actual damage awards to *all plaintiffs*.").  In *Drilex Systems, Inc. v. Flores*, 1 S.W.3d 112, 122 (Tex. 1999),[50] the supreme court interpreted the definition of "claimant" in the context of a settlement credit under Chapter 33.  Chapter 33 defined "claimant"

---

[49] Gregorio's mother, Catalina, Sr., was awarded $10 million in mental anguish and loss of companionship and society damages.  Combining her damage awards with the other wrongful death beneficiaries' awards to determine the amount of punitive damages available to Gregorio's estate would violate the Texas Constitution.  In *General Chemical Corp. v. De la Lastra*, the Texas Supreme Court faced a similar issue where a decedent's estate sought recovery of exemplary damages.  852 S.W.2d 916, 923 (Tex. 1993).  The decedent's parents brought a wrongful death action along with the survival action, and the trial court combined the actual damages awarded to both the decedent's estate and to the parents in calculating the punitive damage cap.  *Id.* at 922. However, the Texas Constitution prohibits recovery of punitive damages by a deceased's parent.  *See id.* at 922-23  (citing TEX. CONST. art. XVI, § 26 (limiting class of persons who can recover exemplary damages for wrongful death)).  Thus, the supreme court was called upon to consider whether the constitution prohibited inclusion of the parent's actual damages award in calculating the damages cap.  *Id.*  The court held that it did.  *Id.*

[50] Justice Baker's concurrence in *Utts v. Short* questioned *Drilex's* correctness.  81 S.W.3d 822, 833 (Tex. 2002) (Baker, J., concurring).  However, *Drilex* has not been overruled and remains the law.

almost exactly as it is defined by Chapter 41.[51]

In *Drilex*, Jorge Flores was injured, and he and his family asserted claims based on that injury. 1 S.W.3d at 115. When calculating settlement credits, the court concluded that all the plaintiffs, including the injured plaintiff himself, must be considered as a single "claimant" for purposes of applying a settlement credit. *Id.* at 122 ("All of the Flores family members are seeking recovery of damages for injury to Jorge. Thus, under the plain language of section 33.011(1), the term 'claimant' in section 33.012(b)(1) includes all of the family members."). Under *Drilex*, regardless of whether the plaintiff is seeking damages for his own injuries, his recovery can be limited by including the derivative plaintiffs in the definition of "claimant." *Id.* It would be illogical to conclude that under Chapter 33, a party seeking recovery for his own injuries can be combined with derivative plaintiffs for purposes of reducing the injured plaintiff's recovery, but for purposes of ensuring a recovery of punitive damages, the same definition should be applied differently. Accordingly, we hold that the definition of "claimant" includes both Gregorio and his children.[52] Because the

---

[51] At the time, chapter 33 defined "claimant" as:

a party seeking recovery of damages pursuant to the provisions of Section 33.001, including a plaintiff, counterclaimant, cross-claimant, or third-party plaintiff seeking recovery of damages. In an action in which a party seeks recovery of damages for injury to another person, damage to the property of another person, death of another person, or other harm to another person, "claimant" includes both that other person and the party seeking recovery of damages pursuant to the provisions of Section 33.001.

Act of May 4, 1995, 74th Leg., R.S., ch. 136, § 1, 1995 TEX. SESS. LAW SERV. 971, 973 (Vernon), amended by Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 4.05, 4.10(3), 2003 TEX. SESS. LAW SERV. 847, 856, 859 (Vernon) (codified as TEX. CIV. PRAC. & REM. CODE ANN. § 33.011(1)).

[52] Wackenhut cites our decision in *Adolph Coors Co. v. Rodriguez*, arguing that when a jury makes findings that a defendant caused actual damages to one plaintiff, but not another plaintiff, the plaintiff who did not obtain a finding of actual damages cannot recover exemplary damages. 780 S.W.2d 477, 478-79 (Tex. App.–Corpus Christi 1989, writ denied). That case, however, did not involve a survival and wrongful death action, for which the term "claimant" is defined differently. *See id.* Thus, *Rodriguez* is inapplicable and does not require a different outcome.

legislature stated that a "claimant may recover exemplary damages, even if only nominal damages are awarded, if the claimant establishes by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from malice," and Gregorio's children recovered more than nominal damages, the "zero damages rule" does not apply. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.004 (b).[53]

## VIII. STATUTORY CAP ON PUNITIVE DAMAGES

In its fourth issue, Wackenhut argues that if exemplary damages were properly awarded, the exemplary damages award should be capped. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(b).[54] The 1995 version of the statute provided that

> exemplary damages awarded against a defendant may not exceed an amount equal to the greater of:
>
> (1)    (A)    two times the amount of economic damages plus
>
>         (B)    an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or
>
> (2)    $200,000, whichever is greater.

*Id.* "Economic damages" was defined as "compensatory damages for pecuniary loss; the term does not include exemplary damages or damages for physical pain and mental anguish, loss of consortium, disfigurement, physical impairment, or loss of companionship

---

[53] *See* Act of Apr. 6, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 TEX. SESS. LAW SERV. 108, 110 (Vernon). We note that under the statute's current version, the same result would not obtain because the legislature subsequently deleted the provision allowing plaintiffs to recover exemplary damages based on an award of nominal damages only when the jury finds malice. Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 13.05, 2003 TEX. SESS. LAW SERV. 847, 888 (Vernon).

[54] Wackenhut correctly asserts that the prior, 1995 version of this statute applies to the family's claim. We note, however, that the statutory amendments since 1995 have not altered the damage cap amounts. *Compare* Act of Apr. 6, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 TEX. SESS. LAW SERV. 108, 110 (Vernon), *with* Act of May 21, 2001, 77th Leg., R.S., ch. 643, § 3, 2001 TEX. SESS. LAW SERV. 1136, 1137 (Vernon ); *and* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 13.06, 2003 TEX. SESS. LAW SERV. 847, 888 (Vernon); *and* Act of May 17, 2007, 80th Leg., R.S., ch. 593, § 3.03, 2007 TEX. SESS. LAW SERV. 1122, 1132 (Vernon).

and society." *Id.* § 41.001(4) (Vernon 1995)).

The trial court awarded EMS expenses in the amount of $551.50. These are economic damages. *See id.* The jury awarded $2 million in future mental anguish and $2 million in future loss of companionship and society to each of Gregorio's three children, for a total of $12 million. These damages are noneconomic damages. *See id.* Thus, if we apply the statutory cap, Gregorio's estate would be limited to recovering $751,103[55] against *each* defendant. *See id.* § 41.008(b) (Vernon 1995); *Seminole Pipeline Co. v. Broadleaf Partners, Inc.,* 979 S.W.2d 730, 752 (Tex. App.–Houston [14th Dist.] 1998, no pet.) (holding cap applied on a per defendant basis and not to the entire award of exemplary damages).

The award against Warden Forrest was within the cap; thus, no reversible error is present with regard to the award against Warden Forrest. *See* TEX. R. APP. P. 44.1(a)(1) (stating appellant must show that error "probably caused the rendition of an improper judgment"). Accordingly, for that reason, we affirm the award of $500,000 in exemplary damages to Gregorio's estate against Warden Forrest. *Id.* If we apply the statutory cap to the award against Wackenhut, however, the award would be limited to $751,103.

The family argues that Wackenhut waived the statutory cap on punitive damages by failing to plead it, and in any event, Texas law allows for uncapped punitive damages for aggravated assault and malicious wrongful death. TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(c)(1), (4). We agree that Wackenhut was required to plead the damage cap, particularly given that during trial the family asserted that the cap needed a supporting

---

[55] We arrive at this calculation by doubling the award of EMS expenses and adding it to the $750,000 allowed for non-economic damages. TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(b).

pleading and that it was relying on the state of the pleadings in withdrawing issues from the jury.

Texas Rule of Civil Procedure 94 provides:

In pleading to a preceding pleading, a party shall set forth *affirmatively* accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, *and any other matter constituting an avoidance or affirmative defense*. . . .

TEX. R. CIV. P. 94 (emphasis added).  In *Shoreline, Inc. v. Hisel*, this Court held that "[w]here maximum damages are provided in statutes in Texas, and a defendant wants to rely on the cap, it is considered a defense that must be [pleaded] and proved."  115 S.W.3d 21, 25 (Tex. App.–Corpus Christi 2003, pet. denied).  Although in that case we were applying the damage limitation in section 21.2585(d) of Texas Labor Code, we expressly cited Texas Rule of Civil Procedure 94 *and* the punitive damage cap provision in Chapter 41.  *Id.* (citing TEX. CIV. PRAC. & REM. CODE ANN. § 41.008 (Vernon Supp. 2003)).  The Fort Worth Court of Appeals has likewise held that section 41.008's punitive damages cap is an affirmative defense that must be pleaded.  *Horizon/CMS Healthcare Corp. v. Auld*,  985 S.W.2d 216, 233 (Tex. App.–Fort Worth 1999), *rev'd in part on other grounds*, 34 S.W.3d 887 (Tex. 2000).

Wackenhut argues that *Shoreline* is distinguishable because Texas Labor Code section 21.2585 requires the defendant to prove the number of employees it has in order

96

to determine the cap amounts. *See* TEX. LABOR CODE ANN. § 21.2585(d) (Vernon 2006).[56]

In contrast, Wackenhut argues that the cap in section 41.008 does not require any proof to establish its applicability—in other words, because defendants have nothing to prove, there is nothing to plead. *See Hall v. Diamond Shamrock Ref. Co., L.P.,* 82 S.W.3d 5, 22-23 (Tex. App.–San Antonio 2001), *overruled on other grounds,* 168 S.W.3d 164 (Tex. 2005)*; Seminole Pipeline Co.,* 979 S.W.2d at 758-59. We disagree.

First, we note that in applying damage caps under other statutory schemes, where the caps' application did not require any additional proof by the defendant, courts have nevertheless required defendants to plead the caps as an affirmative defense. *See Ingraham v. U.S.,* 808 F.2d 1075, 1079 (5th Cir. 1987) (holding that Texas's "statutory limit on medical malpractice damages is an affirmative defense which must be pleaded timely . . . ."); *Webster v. Johnson*, 737 S.W.2d 884, 889 (Tex. App.–Houston [1st Dist.] 1987, writ denied) (holding that defendant waived the liability cap in former article 4590i by failing to plead the cap). In fact, this Court held as much in *Tsai v. Wells*, 725 S.W.2d 271,

---

[56] The caps in that section are applied based on the number of the defendant's employees:

(d)  The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses and the amount of punitive damages awarded under this section may not exceed, for each complainant:

(1)  $50,000 in the case of a respondent that has fewer than 101 employees;

(2)  $100,000 in the case of a respondent that has more than 100 and fewer than 201 employees;

(3)  $200,000 in the case of a respondent that has more than 200 and fewer than 501 employees; and

(4)  $300,000 in the case of a respondent that has more than 500 employees.

TEX. LABOR CODE ANN. § 21.2585(d) (Vernon 2006).

275 (Tex. App.–Corpus Christi 1986, writ ref'd n.r.e.).  Wackenhut fails to acknowledge or distinguish this controlling authority.[57]

Second, we disagree that the purpose for requiring a defendant to plead a matter of avoidance is solely to allow the plaintiff notice that the defendant intends to offer evidence of a particular fact.  In fact, in addition to this purpose, a defendant's pleading of an affirmative defense puts the plaintiff on notice that the affirmative defense needs to be *defeated*, and it allows the plaintiff to structure his or her case in order to defeat the affirmative defense, if possible.  It is well established law that

> [t]he purpose of Rule 94 is indicated forcibly by the provision that a party must affirmatively plead certain named defenses, and "any other matter constituting an avoidance or affirmative defense."  That purpose is to require the defendant to announce in his pleadings what his defense will be, if it includes any of the matters referred to in the Rule, *and to give plaintiff the opportunity of knowing what character of proof he may need to meet the defenses pleaded.*

*Reid v. Associated Employers Lloyds,* 164 S.W.2d 584, 585 (Tex. Civ. App.–Fort Worth 1942, writ ref'd); *see Gorman v. Life Ins. Co. of N. Am .,* 811 S.W.2d 542, 546 n.8 (Tex. 1991) (quoting *Reid*, 164 S.W.2d at 585); *First Nat'l Bank in Dallas v. Zimmerman*, 442 S.W.2d 674, 677 (Tex. 1967); *Petroleum Anchor Equip., Inc. v. Tyra*, 419 S.W.2d 829, 835 (Tex. 1967) (holding that this rule is "sound" and prevents a defendant from waiting until after a verdict to assert a defense when it is too late for the plaintiff to defeat it); *Favaloro v. Comm'n for Lawyer Discipline,* 13 S.W.3d 831, 837-38 (Tex. App.–Dallas 2000, no pet.);

---

[57] Courts have held that a governmental entity does not waive the liability limits under the Texas Tort Claims Act by failing to plead the limits.  However, given that the Tort Claims Act is a limited waiver of sovereign immunity from suit, a court's jurisdiction is necessarily limited to the amounts stated in the Tort Claims Act.  *See, e.g., State Highway Dep't v. Pinner*, 531 S.W.2d 851, 858 (Tex. Civ. App.–Beaumont 1975, no writ) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 101.023).  These cases have no applicability to the present issue, which does not involve a question of subject-matter jurisdiction.

*Garcia v. Rutledge*, 649 S.W.2d 307, 310 (Tex. App.–Amarillo 1982, no writ); *see also*

*State v. One (1) Red 1988 Chevrolet Silverado,* No. 13-00-143-CV, 2001 WL 1002159, at

*1 (Tex. App.–Corpus Christi June 14, 2001, no pet.) (not designated for publication).

Contrary to Wackenhut's arguments, the damages cap in section 41.008(b) does

not automatically apply in every case. Section 41.008(c) provides several "cap-busting"

theories that can apply in a given case:

> (c)     Subsection (b) does not apply to a cause of action against a defendant from whom a plaintiff seeks recovery of exemplary damages based on conduct described as a felony in the following sections of the Penal Code if, except for Sections 49.07 and 49.08, the conduct was committed knowingly or intentionally:
>
> (1)     Section 19.02 (murder);
>
> . . . .
>
> (4)     Section 22.02 (aggravated assault)
>
> . . . .
>
> (11)    Section 32.46 (securing execution of document by deception)
>
> . . . .

TEX. CIV. PRAC. & REM. CODE § 41.008(c). The family was entitled to notice that Wackenhut

intended to assert the cap so that its case could be structured to present a "cap-busting"

theory. *See Reid*, 164 S.W.2d at 585; *see also Gorman*, 811 S.W.2d at 546 n.8;

*Zimmerman*, 442 S.W.2d at 677; *Tyra*, 419 S.W.2d at 835. Accordingly, we hold that the

damages cap in section 41.008 must be pleaded or else it is waived.

Wackenhut argues that the family was not prejudiced by its failure to plead the cap

because: (1) the family should have been aware that contrary authority does not require

a pleading; and (2) in any event, the family pleaded and unsuccessfully attempted to prove

99

"cap-busting" theories, despite Wackenhut's failure to plead the cap. Under the circumstances of this case, we disagree.

First, we have already held that the "contrary" authority is incorrect based on well-established precedent. Second, we disagree that Wackenhut's failure to plead the cap did not prejudice the family. In fact, we believe that although not technically a violation of counsel's duty of candor to a tribunal, the conduct of Wackenhut's counsel at trial was less than forthcoming. *See* Texas Lawyer's Creed at III.7, *available at* http:// www.txethics.org/ reference_creed. asp (last visited Feb. 7, 2009) ("I will not serve motions or pleadings in any manner that unfairly limits another party's opportunity to respond.").

After the family concluded its case in chief, Wackenhut moved for a directed verdict on the family's claims for assault and battery. The family argued that it was asserting penal code violations "for other purposes should they become necessary." The family explained that these theories "could be used for other things, possibly for the punitive damage issues or other things that may come up," but informed the court that the purpose of pleading the penal code provisions was not to obtain the recovery of damages for their violation. Wackenhut did not respond to this argument.

Later in the hearing, Wackenhut moved for a directed verdict on the family's common nuisance theory. The family argued that it was not asserting nuisance as a cause of action that could provide the recovery of damages, but for "other purposes." The court inquired as to what those other purposes were, to which the family's counsel responded:

> Well, it's possible that we may be required to prove that under Chapter 41. Chapter 41 concerns punitive damages. It's possible that under some circumstances in the future, we have to prove that to get punitive damages. . . . .

100

. . . .

Now, the reason why it's important is—and we are trying to cover all our bases here, obviously. I would like to direct the court's attention to two cases, 34 S.W.3d 887, *Horizon Healthcare Corporation v. Auld*, and 115 S.W.3d 21, *Shoreline, Inc. v. Hisel.* The *Hisel* case is a Corpus Christi decision from 2003. I will show these to counsel.

These two cases stand for the unremarkable proposition that in order for a defendant to assert a defense they have to plead it. In this case, the defendants have not pled Chapter 41 of the Civil Practice and Remedies Code as a defense to this case; therefore, they are not entitled to the benefits of Chapter 41 of the Civil Practice and Remedies Code.

The only reason why we are talking about common nuisance is because we are concerned that for some reason they might try to spring this defense on us in the middle of trial. So we would respectfully, you know, point out to the court that since they haven't pled it and it's not an issue in this case *and we've relied on their pleadings and the state of their pleadings, this nuisance issue is probably moot.*

(Emphasis added).

Wackenhut did not speak up or dispute the family's characterization of its pleadings. Nor did Wackenhut attempt to distinguish our decision in *Hisel* or argue that under other case law, it was not required to plead the damages cap. Moreover, Wackenhut was expressly notified that the family was relying on the state of the pleadings. Wackenhut could have requested a trial amendment at that point or at any other point during trial when the family retained the opportunity to meet the defense. *See* TEX. R. CIV. P. 66.[58]

---

[58] Rule 66 provides:

If evidence is objected to at the trial on the ground that it is not within the issues made by the pleading, or if during the trial any defect, fault or omission in a pleading, either of form or substance, is called to the attention of the court, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the allowance of such amendment *would prejudice him in maintaining his action or defense upon the merits.* The court may grant a postponement *to enable the objecting party to meet such evidence.*

TEX. R. CIV. P. 66 (emphasis added).

101

However, it did not.

At the end of trial, on the first day of the charge conference, the family proposed a question on securing the execution of a document by deception.  Wackenhut argued that this was not a "theory of civil recovery" and that "there is no evidence" to support such a question.  In response, the family again stated that it was submitting this question "out of an abundance of caution," but clearly stated that it was likely unnecessary "because there are no pleadings that would support the requirement for us to submit this question."  Again, Wackenhut did not dispute the family's construction of Wackenhut's pleadings, did not argue that it was not required to plead the damages cap, or otherwise indicate in any way that it intended to rely on the damages cap.

After the jury verdict, Wackenhut raised the punitive damages cap for the first time in its "Motion to Disregard Jury Findings and for Judgment Notwithstanding the Verdict and Objections to Plaintiff's Motion for Judgment."  At that point, it was too late for the family to meet the defense by securing findings on the "cap-busting" theories.

Wackenhut's failure to speak up and to affirmatively assert its reliance on the cap allowed both opposing counsel, and the trial court, to proceed under the assumption that it did not intend to assert the cap.  *See Am. Paging of Tex., Inc. v. El Paso Paging, Inc.*, 9 S.W.3d 237, 241 (Tex. App.–El Paso 1999, pet. denied) (noting that there are circumstances where counsel's failure to disclose a material fact is the equivalent of an affirmative misrepresentation); *see also* Texas Lawyer's Creed at III.7.  The family specifically informed Wackenhut that it was relying on the state of the pleadings in shaping the rest of its case, and Wackenhut remained silent.  The family was surely justified in its reliance on Wackenhut's silence.  *See Ingraham,* 808 F.2d at 1079 (noting plaintiffs'

argument that it would have structured its proof differently had it known that medical malpractice damage cap would be asserted, and holding that defendant should not be "permitted to 'lie behind a log' and ambush a plaintiff with an unexpected defense."). Accordingly, we hold that Wackenhut waived its right to impose the cap. *See Tyra*, 419 S.W.2d at 835. We overrule Wackenhut's fourth issue.[59]

## IX. CONSTITUTIONAL LIMITS ON PUNITIVE DAMAGES

By its fifth issue, Wackenhut argues that the award of exemplary damages violates its due process rights under the Fourteenth Amendment to the United States Constitution. *See* U.S. CONST. amend. XIV; *BMW of N. Am. v. Gore*, 517 U.S. 559, 568 (1996); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 308 (Tex. 2006); *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 45 (Tex. 1998). We disagree.

In *BMW of North America v. Gore*, the United States Supreme Court held that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." 517 U.S. at 574. The Court set out three "guideposts" by which we must judge the constitutionality of punitive damage awards. *Id.* First, we consider the "the degree of reprehensibility" of the defendant's conduct. *Id.* at 575. Second, we consider the disparity between the harm or potential harm suffered and the punitive damages award. *Id.* Third, we examine the difference between the punitive damages award and "the civil penalties authorized or imposed in comparable cases." *Id.* We will address each guidepost in turn.

---

[59] Because of our holding, we need not address the family's arguments that the findings the jury made were sufficient to support a cap-busting theory. *See* TEX. R. APP. P. 47.1.

## A. Degree of Reprehensibility of Wackenhut's Conduct

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* The Supreme Court explained that this guidepost reflects the notion that "some wrongs are more blameworthy than others." *Id.* For example, the Court explained that "nonviolent crimes are less serious than crimes marked by violence or the threat of violence," and "'trickery and deceit,' are more reprehensible than negligence." *Id.* at 576 (citations omitted). Thus, in *State Farm Mutual Auto Insurance Co. v. Campbell,* the Supreme Court held that when considering the reprehensibility of a defendant's conduct, courts are to examine whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." 538 U.S. 408, 419 (2003).

Wackenhut does not address this guidepost. It does not argue at any point in its brief that its conduct was not reprehensible. For this reason, the family argues that Wackenhut has waived its due process argument. We disagree that the failure to address this guidepost waives Wackenhut's due process claim; however, it does affect our analysis. In *Campbell*, the Court explained that "[t]he existence of any one of these factors weighing in favor of a plaintiff *may not be sufficient to sustain* a punitive damages award; and the absence of all of them renders any award suspect." *Id.* (emphasis added). Thus, even if the plaintiff establishes that the conduct is the most reprehensible conduct imaginable, we

104

must nevertheless consider the other "guideposts" to analyze the due process claim, albeit with reference to the reprehensible conduct. *See id.*

We hold that nearly all the indicators of reprehensible conduct exists in this record.[60] First, the harm caused to Gregorio and his family was physical rather than merely economic. *See USA Truck, Inc. v. West*, 189 S.W.3d 904, 911 (Tex. App.–Texarkana 2006, pet. denied). This case involves "the most serious injury of all—death to a human being." *Id.* at 910. Second, the record shows that Wackenhut and Warden Forrest were indifferent to and acted in reckless disregard for Gregorio's safety. For example, Wackenhut repeatedly violated the post order for the crash gate leading to the "bowling alley" by failing to conduct pat-searches of all inmates going through the gate, even though it was aware that locks were available to inmates and could be used as weapons. In fact, other fights had occurred at the Wackenhut facility involving the use of locks in the same manner, and Wackenhut knew about these fights. Additionally, testimony from two witnesses showed that Wackenhut's wardens callously disregarded Gregorio's safety by smirking and laughing while Gregorio was beaten to death. *See Malone*, 972 S.W.2d at 46.

Furthermore, and no less importantly, the trial court instructed the jury that Wackenhut and Warden Forrest intentionally spoliated evidence.[61] "Evidence of post-act

---

[60] We note that one element suggested by the Supreme Court, whether "the target of the conduct had financial vulnerability," does not seem particularly appropriate in the context of a survival and wrongful death action. *See USA Truck, Inc. v. West*, 189 S.W.3d 904, 911 (Tex. App.–Texarkana 2006, pet. denied). We note, however, that Gregorio certainly was vulnerable in the sense that he relied on Wackenhut to ensure his safety as against the other prisoners.

[61] Wackenhut has not challenged the evidence supporting the jury's findings of malice and gross negligence, and it does not dispute that the jury was entitled to consider the spoliation instruction and the evidence of spoliation when awarding punitive damages. *See Bennett v. Reynolds*, 242 S.W.3d 866, 901

105

attempts by tortfeasors to cover-up or avoid responsibility for their acts may imply a consciousness that their acts were intentional or willful, and not a mere mistake or accident." *Bennett v. Reynolds,* 242 S.W.3d 866, 889-90 (Tex. App.–Austin 2007, pet. filed); *see Transmission Exch. Inc. v. Long*, 821 S.W.2d 265, 273 (Tex. App.–Houston [1st Dist.] 1991, writ denied). Warden Forrest expressly testified in his deposition that he had seen a videotape that showed the beating and Gregorio's injuries, which he described in detail. Amazingly, Warden Forrest amended his deposition to testify that the "video" he testified to seeing was in reality a movie he had "created" in his mind based on information he had learned about the beating. Testimony also showed that while one lock was produced in discovery and claimed by Wackenhut to be the only weapon used in the beating, two lock shanks were found in the "bowling alley," indicating that the inmates passed two locks through the crash gate. The second lock was never produced; thus, the jury was entitled to presume that Wackenhut intentionally destroyed this evidence as well to lessen its liability. These cover-up attempts show "intentional malice, trickery, and deceit." *Bennett,* 242 S.W.3d at 903.

Punitive damages are intended to punish and deter tortious conduct through the civil justice system. *Id.* However, Wackenhut's conduct also implicates another important and basic policy underlying punitive damages—"preserving the integrity of [our] courts and the rule of law." *Id.* By spoliating evidence, Wackenhut attempted to "undermine Texas's civil justice system itself." *Id.* We find that Wackenhut's conduct was clearly reprehensible

---

(Tex. App.–Austin 2007, pet. filed) (noting that defendants had not challenged "factual" validity of punitive damage award and noting that jury was instructed it could consider the defendants' "conduct," which included a subsequent cover-up).

106

and, frankly, constituted a disgusting display of disrespect for the welfare of others and for this State's civil justice system.

**B.     Disparity Between the Harm or Potential Harm Suffered and the Punitive Damages Award**

The second "guidepost" is the "disparity between the harm or potential harm suffered and the punitive damages award." *Gore*, 517 U.S. at 575. Wackenhut argues that we must compare the award of zero damages to Gregorio's estate or, in the alternative, the trial court's meager award of $7,511 for funeral and EMS expenses, with the award of $20.5 million in punitive damages. Under this theory of the case, Wackenhut asserts that the award of punitive damages is more than 2,633 times the amount of actual damages.

Wackenhut concedes that there is no "bright-line" ratio that will automatically violate due process, but it cites *Tony Gullo Motors I, L.P. v. Chapa*, where the Texas Supreme Court stated that "'few awards exceeding a single-digit ratio . . . will satisfy due process.'" 212 S.W.3d at 308 (quoting *Campbell*, 538 U.S. at 425). Wackenhut argues that "'four times the amount of compensatory damages might be close to the line of constitutional impropriety.'" *Id.* (quoting *Campbell*, 538 U.S. at 425). In response, the family argues that the second "guidepost" must be determined not only with respect to the actual damages awarded, but with respect to the gravity of the misconduct and the potential harm to both Gregorio and his family. We agree.

The proper inquiry is "'whether there is a reasonable relationship between the punitive damages award and the harm *likely to result* from the defendant's conduct as well as the harm that actually has occurred.'" *Gore*, 517 U.S. at 581 (quoting *TXO Prod. Co. v.*

107

*Alliance Res. Corp.*, 509 U.S. 443, 459 (1993) (emphasis in original). In *Gore*, the Court noted that it had "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, *even one that compares actual and potential damages to the punitive award.*" *Id.* at 582 (emphasis added). "Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Id.* For example, "[a] higher ratio may . . . be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Id.* The precise amount of the award that is constitutionally permissible necessarily must be judged in light of the defendant's conduct and the actual or potential harm to the plaintiffs. *Campbell*, 538 U.S. at 425; *Bennett*, 242 S.W.3d at 905; *Baribeau v. Gustafson,* 107 S.W.3d 52, 64 (Tex. App.–San Antonio 2003, pet. denied) ("This argument is that the punishment should not fit the conduct, but instead should only fit the damages awarded. Instead, we believe that the penalty should fit the gravity of the misconduct, not simply the actual damages awarded by a jury."). Even where a plaintiff is precluded by law from recovering actual damages against the defendant, Texas courts have held that the failure to recover actual damages does not necessarily result in a finding that an award of exemplary damages is constitutionally infirm. *See Universal Servs. Co., Inc. v. Ung,* 882 S.W.2d 460, 464 (Tex. App.–Houston [14th Dist.] 1994) (holding that award of exemplary damages was not necessarily excessive because the jury failed to award actual damages in worker's compensation case because actual damages were statutorily prohibited), *rev'd on other grounds*, 904 S.W.2d 638 (Tex. 1995) (citing *Wright*

108

*v. Gifford-Hill & Co.*, 725 S.W.2d 712, 714 (Tex. 1987)).

The damages question asked the jury to award damages to Gregorio's estate for (1) physical pain in the past, (2) mental anguish in the past, and (3) disfigurement in the past. Without a doubt, these elements of damages are difficult for juries to calculate, particularly when the person injured is deceased and cannot testify to his own pain and suffering and mental anguish. The jury awarded zero damages for these elements.

We presume that the jury declined to award these damages because the testimony at trial indicated that Gregorio was rendered completely incapacitated upon the first hit with the sock containing the lock. At trial, Officer Cortez testified that he believed that the first hit with the sock knocked Gregorio out because he did not fight back. Officer Hernandez saw the incident, and he reported that after the sock hit Gregorio, he did not fight back.

Dr. Sims, the emergency room doctor who examined Gregorio when he was first brought to the hospital, testified that Gregorio did not appear to be in a lot of pain. Sims stated that Gregorio "may have been a little bit dulled mentally by his—by the seriousness of his acute injury, and he wasn't in pain like a kidney stone patient is in pain, like a gallstone patient is in pain." Sims "presumed" he was in some pain, but could not quantify the amount. Sims also testified that he "could not comment," as a doctor, on whether Gregorio appeared "scared." His "common sense" opinion was that he did not recall that Gregorio looked scared; rather, his appearance was "of someone who was injured." He testified that when a person's blood pressure is beginning to drop, as Gregorio's was, "one may be sort of dulled in a sense that the normal human emotions that one might expect in a certain situation may not be all that evident."

Given that we must consider not only the actual damages the jury awarded, but also

109

the difficulty of calculating particular types of damages and the *potential* injury to the plaintiff, we hold that Gregorio's death certainly justifies a higher ratio of punitive damages than in a typical case involving only economic damages. *Gore*, 517 U.S. at 582; *Malone*, 972 S.W.2d at 46 ("Conduct that endangers a person's health or safety merits more punishment than purely economic harm.); *see USA Truck, Inc.*, 189 S.W.3d at 911. Moreover, Wackenhut should not be permitted to complain that the award is excessive because its victim did not suffer "actual damages," given that its egregious conduct caused an injury so severe and immediate that the victim was rendered senseless and thereby unable to feel the pain and suffering and mental anguish that would logically result from the conduct. *See Gore*, 517 U.S. at 582.

Even so, in wrongful death actions, when considering the ratio of punitive damages to the actual injury, Texas courts have taken into account (1) the actual damages awarded to the deceased through a survival action, (2) the damages awarded to the wrongful death beneficiaries, *and* (3) the extent to which a maliciously caused death offends a public sense of justice. *See Armstrong v. Randle*, 881 S.W.2d 53, 59 (Tex. App.–Texarkana 1994, writ denied); *Mo. Pac. R.R. Co. v. Lemon,* 861 S.W.2d 501, 526 (Tex. App.–Houston [14th Dist.] 1993, writ dism'd by agr.) ("The jury had many intangible factors to consider in trying to put a price on the loss of human life. The life of a wife, mother, daughter whom the evidence showed was dearly loved and sorely missed."). If we consider the damages awarded to Gregorio's children, a total of $12 million, the ratio of punitive damages to actual damages is less than 2 to 1 with respect to the award against Wackenhut, and less than 1 to 1 with respect to the award against Warden Forrest. These ratios are well within

110

constitutional limits. *Malone*, 972 S.W.2d at 46-47.[62] Moreover, Wackenhut's conduct in maliciously causing Gregorio's death and thereafter spoliating critical evidence so offends this Court's sense of justice that a high ratio is warranted. *Bennet*, 242 S.W.3d at 904-05; *Armstrong*, 881 S.W.2d at 59.

## C.     The Civil Penalties Authorized or Imposed in Comparable Cases

Finally, we must consider "the civil penalties authorized or imposed in comparable cases." *Gore*, 517 U.S. at 575; *Malone*, 972 S.W.2d at 47. The Texas Supreme Court has noted that actions for personal injury or death do not lend themselves to a comparison with statutory penalties. *Malone*, 972 S.W.2d at 47. In these circumstances, the supreme court has held that "judicial decisions at the time of the misconduct are also relevant under *Gore's* third prong to ascertain whether a defendant had notice that its misconduct could subject it to a large punitive damages award." *Id.*

---

[62] We note that in *Tony Gullo*, the Texas Supreme Court observed that mental anguish damages often contain a punitive element. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 308 (Tex. 2006). In *Campbell*, on which *Tony Gullo* relied, the United States Supreme Court discussed the plaintiffs' award of punitive damages in an action against their insurer for refusing to settle a claim against them within their policy limits and then refusing to pay an excess judgment. *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 413 (2003). The Court noted that the plaintiffs had received $1 million in mental anguish damages, which the Court held likely included a punitive element given that the harm suffered from the conduct was purely economic:

> The harm arose from a transaction in the economic realm, *not from some physical assault or trauma; there were no physical injuries;* and State Farm paid the excess verdict before the complaint was filed, so the Campbells suffered only minor economic injuries for the 18-month period in which State Farm refused to resolve the claim against them. The compensatory damages for the injury suffered here, moreover, likely were based on a component which was duplicated in the punitive award.

*Id.* (emphasis added). First, Wackenhut does not argue that the punitive damages should not be judged with reference to the awards to Gregorio's children because these awards may contain a punitive element. Second, we do not believe that the statements in *Tony Gullo* or *Campbell* were intended to imply that a plaintiff's recovery for mental anguish damages *always* includes a punitive element. We have already reviewed the awards to Gregorio's children and have determined they were supported by legally and factually sufficient evidence and were not excessive.

111

The underlying concern in a substantive due process analysis of a punitive damages award is ensuring that the award of punitive damages is reasonable in relation to the State's legitimate interest in punishing unlawful conduct and in deterring its repetition. *Gore*, 517 U.S. at 568. The purpose, as Justice O'Connor explained, of ensuring fair notice of the penalty's severity is so that the defendant can structure his conduct to avoid the penalty. *See Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 59 (1991) (O'Connor, J., dissenting).

Wackenhut claims that at the most, only four times the amount of actual damages (four times $7,511 or $30,204) should be awarded, as this constitutes the outer boundary of constitutional awards of punitive damages. *See Tony Gullo Motors*, 212 S.W.3d at 308. However, Wackenhut ignores the Texas Supreme Court's holding that wrongful death cases do not involve the same concerns as, for example, a claim under the DTPA that may allow for double, treble, or quadruple damages. *Malone*, 972 S.W.2d at 47. Wackenhut's conduct leading to Gregorio's death occurred in April 2001. Prior to that date, the law was well established, by statute and by judicial opinion, that punitive damages could be awarded in survival and wrongful death actions. Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 TEX. GEN. LAWS 3242, 3295 (current version at TEX. CIV. PRAC. & REM. CODE ANN. § 71.009 (Vernon 2008)); *Hofer v. Lavender*, 679 S.W.2d 470, 473 (Tex. 1984) (cause of action for exemplary damages survives death of injured party); *see also Malone*, 972 S.W.2d at 47 (noting that defendant knew that law provided it could be punished for its conduct through an award of punitive damages.). Wackenhut likewise should have been aware from the relevant case law that calculations of punitive damages included the

112

injuries sustained by both the person injured and by derivative plaintiffs. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.001(1) (definition of "claimant" includes both decedent and wrongful death beneficiaries); *Gen. Chem. Corp.*, 852 S.W.2d at 923; *Geisler,* 9 S.W.3d at 169; *Armstrong*, 881 S.W.2d at 59; *Lemon*, 861 S.W.2d at 526. Most importantly, Wackenhut was aware that actions taken maliciously, recklessly, or with gross negligence that resulted in the injury or death of an individual could be punished with a *large* award of punitive damages. *See Horizon/CMS Healthcare Corporation v. Auld*, 34 S.W.3d 887, 891 (Tex. 2000) (noting that a jury awarded $90 million in exemplary damages to a plaintiff injured in nursing home through gross negligence of nursing home, which was capped at over $9,000,000, and affirmed by the Texas Supreme Court); *Geisler*, 9 S.W.3d at 170 (affirming an award of almost $3 million in punitive damages to decedent's estate in survival action); *N. Am. Refractory Co. v. Easter*, 988 S.W.2d 904, 920 (Tex. App.–Corpus Christi 1999, pet. denied) (affirming an award of $1.3 million in punitive damages to decedent's estate in survival action). Given the horrific facts of this case, including Wackenhut's malicious and grossly negligent conduct, the gruesome manner in which Gregorio was killed, and Wackenhut's behavior in attempting to cover up its liability, we hold that all three of the guideposts under *Gore* support the award of punitive damages in this case, which does not violate due process. We overrule Wackenhut's fifth issue and affirm the award of punitive damages.

## X. Conclusion

Because we find that Gregorio, Sr.'s estate lacked standing to recover wrongful death damages, we reverse the award of $5 million to the estate and render judgment

113

dismissing the estate's claim for lack of subject-matter jurisdiction.  We also reverse the trial court's award of $7,000 for funeral expenses.  Having overruled all of Wackenhut's other issues, we affirm the remainder of the judgment.

_____
GINA M. BENAVIDES,
Justice

Opinion delivered and filed this
the 2nd day of April, 2009.